RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0327p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

SOUTHEAST TEXAS INNS, INC.,

      *Plaintiff-Appellant,*

*v.*

No. 05-5892

PRIME HOSPITALITY CORPORATION,

      *Defendant-Appellee.*

————————

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
Nos. 04-00347; 03-00635—William J. Haynes, Jr., District Judge.

Argued: March 6, 2006

Decided and Filed: August 30, 2006

Before: SUTTON and GRIFFIN, Circuit Judges; OBERDORFER, District Judge.[*]

————————

## COUNSEL

**ARGUED:** Eugene N. Bulso, Jr., BOULT, CUMMINGS, CONNERS & BERRY, Nashville, Tennessee, for Appellant. Garry K. Grooms, STITES & HARBISON, Nashville, Tennessee, for Appellee. **ON BRIEF:** Eugene N. Bulso, Jr., Melissa Ballengee Alexander, BOULT, CUMMINGS, CONNERS & BERRY, Nashville, Tennessee, for Appellant. Garry K. Grooms, Stephen H. Price, STITES & HARBISON, Nashville, Tennessee, for Appellee.

      GRIFFIN, J., delivered the opinion of the court, in which SUTTON, J., joined. OBERDORFER, J. (pp. 15-16), delivered a separate dubitante.

————————

## OPINION

————————

      GRIFFIN, Circuit Judge. This cause of action arises from the breach of a lease agreement executed between plaintiff-appellant Southeast Texas Inns, Inc. ("Southeast"), a Tennessee corporation, and May-Ridge, L.P. ("May-Ridge"), a Delaware limited partnership and subsidiary

————————

[*]The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

of defendant-appellee Prime Hospitality Corporation ("Prime").[1]  Southeast sued Prime, the alleged alter ego of May-Ridge, seeking to pierce May-Ridge's corporate veil in order to hold Prime liable for May-Ridge's breach of contract.  The district court granted Prime's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  Southeast now timely appeals the order of dismissal.  We affirm.

## I.

On July 9, 2000, Southeast and May-Ridge executed an eleven-year lease agreement ("the Lease"), whereby May-Ridge agreed to rent and operate three Southeast-owned AmeriSuites hotels located in Texas from July 9, 2000, until June 20, 2011.[2]  Under the pertinent terms of the Lease, May-Ridge was to pay $242,687 per month as "Minimum Rent," along with "Additional Rent," if applicable, "with respect to each Property with respect to each Lease Year beginning with the 2001 Lease Year, in an amount, not less than zero, equal to eight percent (8%) of Excess Total Hotel Sales for such Property."  In addition, the parties agreed that May-Ridge's obligations under the Lease were to be secured by, *inter alia*, certain "Retained Funds" held by Southeast, as well as the hotels' personal property.[3]  Pursuant to § 21.6 of the Lease, May-Ridge was to maintain a minimum net worth "in an amount at least equal to the aggregate of one year's Minimum Rent payable pursuant to this Agreement; it being expressly understood and agreed that the right to receive the Retained Funds, if assigned to Tenant, may for such purpose be counted as equity at the full amount thereof."  Section 3.5 of the Lease further provides that Southeast shall hold the Retained Funds as security for performance by May-Ridge of the terms of the Lease and, in the event of default, Southeast may apply the entire amount of the Retained Funds as may be necessary to compensate Southeast toward the payment of rent or other damages sustained due to such breach by May-Ridge.

The Lease, at § 22.16, also contains a "nonrecourse" provision, which provides that "[n]othing contained in this Agreement shall be construed to impose any liabilities or obligations on Tenant's general partners, limited partners, agents or employees (or any shareholders, officers, directors, agents or employees of any of the foregoing) for the performance of the obligations of Landlord or Tenant hereunder."  Although Prime signed the Lease, its signature served only to "acknowledge[] and agree[] to be bound by the provisions of Section 22.11 [the trade area restriction] of the foregoing Lease Agreement," and neither Prime nor any company affiliated with Prime signed a guaranty of the Lease.  In fact, although the original purchase agreement expressly contemplated that Prime would provide a limited guaranty of the Lease equal to one year's base rent, the parties intentionally struck and deleted this "Prime Guaranty" provision when the amended

---

[1]Prime is a publicly-traded company that owns, franchises, operates and manages hotels across the country. Prime is the franchisor of AmeriSuites and Wellesley Inn & Suites hotel chains.  In May 2000, Ridgewood Holding Corporation ("Ridgewood"), a Delaware corporation and wholly owned subsidiary of Prime, and another Prime entity, Maywood Holding Corporation, formed May-Ridge as a Delaware limited partnership with its principal place of business in New Jersey.

[2]The Lease had its genesis in a Sales and Purchase Agreement ("original purchase agreement") dated May 16, 2000, entered into between Prime and Southeast's parent company, ShoLodge, Inc.  The original purchase agreement was amended by agreement on July 9, 2000 ("amended purchase agreement"), the same date the lease was consummated.

[3]Section 1.81 of the Lease provides that "'Retained Funds' means approximately $3.1 million, an amount in excess of the minimum annual rent due under the Lease of about $2.9 million.

purchase agreement was executed.**4**  Finally, § 22.14 of the Lease provides that Tennessee law governs its interpretation, construction, application, and enforcement.

Both parties abided by the terms of the Lease until March 2003, when Douglas Vicari, Prime's chief financial officer and the president of May-Ridge, allegedly advised John Buttolph, president of Southeast, that May-Ridge planned to "walk away" from the Lease for economic reasons and that the March 2003 rent payment would be its last payment.**5**  When May-Ridge failed to pay rent for the month of April, Southeast terminated the Lease effective April 4, 2003.  Southeast alleges that, as a result of May-Ridge's breach, it lost over $20 million in gross "Minimum Rent" for the eight-year remainder of the Lease term and that it is owed nearly $10 million in liquidated damages.

The present case is an appeal from one of two cases that were consolidated in the district court.  In June 2003, Southeast instituted an action (Case No. 3:03-CV-0635) against May-Ridge, Ridgewood, and Prime to recover damages caused by May-Ridge's alleged breach of the Lease.**6**  Southeast alleged that May-Ridge operated as a mere "alter ego" of Prime and Ridgewood and that the latter two defendants were thus legally responsible for May-Ridge's breach.  Prime and Ridgewood responded by moving to dismiss pursuant to FED. R. CIV. P. 12(b)(6).  Thereafter, in accordance with an Agreed Order, Southeast dismissed without prejudice its claims against Prime and Ridgewood, with leave to amend the pleadings after a designated six-month period of discovery.  Rather than amending its pleadings after the discovery period, Southeast commenced the present, separate lawsuit against Prime (Case No. 3:04-CV-0347) on essentially the same grounds, alleging that Prime actually directed and controlled the operation of the Texas hotels and that May-Ridge, now insolvent, is merely the alter-ego of Prime.  Southeast advances numerous allegations purportedly entitling it to pierce May-Ridge's corporate veil and hold Prime liable for damages incurred as a result of its subsidiary's breach.  The district court consolidated the cases.**7**

Prime promptly filed a Rule 12(b)(6) motion to dismiss in the instant case, contending that Southeast's allegations of undercapitalization or lack of corporate formalities do not rise to the level of fraud or something like fraud necessary to warrant the extreme measure of piercing May-Ridge's corporate veil.

---

**4**The amended purchase agreement, which was executed contemporaneously with the Lease, is frequently referenced in the Lease (*see* §§ 1.65, 1.78, 3.5) attached as an exhibit to Southeast's complaint.  Because it bears directly on Southeast's claims, the amended purchase agreement, in addition to the Lease, may be considered by this court in reviewing the propriety of the order granting Prime's motion to dismiss.  *See Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999) ("[d]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim."), overruled on other grounds by *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

**5**As Southeast acknowledges in Paragraph 14 of its complaint, in the wake of the events of September 11, 2001, "[t]he revenues which the Hotels generated in 2001 and 2002 did not reach the levels which Prime had projected at the time the Lease was executed.  From July 9, 2000, to the end of calendar year 2002, Prime lost approximately $3.5 million in the operation of the Hotels."

**6**The action was initiated in the Chancery Court for Sumner County, Tennessee, and timely removed by May-Ridge to federal court under 28 U.S.C. § 1332, the federal diversity statute.

**7**Ultimately, in Case No. 3:03-CV-0635, the district court entered summary judgment in favor of Southeast with respect to the contract claim against May-Ridge.  Southeast and May-Ridge thereafter entered into an Agreed Final Judgment in favor of plaintiff against May-Ridge in the amount of $7.25 million.  No appeal has been taken from Case No. 3-03-CV-0635.

On January 7, 2005, the district court issued an opinion and order granting Prime's motion to dismiss. The district court concluded that Southeast's complaint failed to allege facts sufficient to state a claim against Prime that would warrant piercing May-Ridge's corporate veil. Specifically, the court held that, although Southeast adequately alleged that Prime exerted complete dominion and control over May-Ridge and Ridgewood, the complaint failed to allege circumstances evincing a fraud or similar injustice, a requisite element of an alter-ego claim under Delaware law. The court thus dismissed all claims against Prime. The district court subsequently denied Southeast's motion to alter or amend the judgment. Southeast timely appeals the judgment in favor of Prime.

## II.

Southeast appeals from an order entered under FED. R. CIV. P. 12(b)(6), which authorizes the dismissal of any complaint that fails "to state a claim upon which relief can be granted." This court reviews the district court's dismissal of a complaint under Rule 12(b)(6) de novo. *Arrow v. Fed. Reserve Bank of St. Louis*, 358 F.3d 392, 393 (6th Cir. 2004). In order to survive a 12(b)(6) motion, the plaintiff's complaint must allege facts which, if proved, would entitle the plaintiff to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In reviewing a 12(b)(6) motion, this court "must construe the complaint in a light most favorable to the plaintiff, accept all of the factual allegations as true and determine whether the plaintiff can prove no set of facts in support of his claims that would entitle him to relief." *Arrow,* 358 F.3d at 393 (citations omitted). "Although this is a liberal pleading standard, it requires more than the bare assertion of legal conclusions. Rather, the complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *NHL Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 468 (6th Cir. 2005) (citation omitted).

Moreover, in any complaint averring fraud or mistake, "the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). *See Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003) (citing FED R. CIV. P. 9(b)). "When a cause of action seeks to pierce the corporate veil on the basis of fraud, it is subject to FED. R. CIV. P. 9(b)." *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,* 296 F.3d 164, 173 n.10 (3d Cir. 2002) (citation omitted).

## III.

A threshold issue is whether Tennessee or Delaware law applies in determining if Southeast's complaint states a cognizable claim to pierce the corporate veil of May-Ridge. In assessing Prime's motion to dismiss, the district court held that issues pertaining to the Lease and its construction, application, and enforcement were governed by Tennessee law in accordance with the choice-of-law rules of the forum state[8] and the express choice-of-law provision contained in

---

[8] Tennessee adheres to the rule of *lex loci contractus* – "a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent." *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999) (citing *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973)). "If the parties manifest an intent to instead apply the laws of another jurisdiction, then that intent will be honored provided certain requirements are met." *Id.* (citing *Goodwin Bros. Leasing, Inc. v. H & B, Inc.,* 597 S.W.2d 303, 306 (Tenn. 1980). The choice-of-law provision must be executed in good faith, the chosen jurisdiction must bear a material connection to the transaction, the basis for the choice of jurisdiction must be reasonable and not a sham, and, finally, the choice of the jurisdiction must not be contrary to the fundamental policy of a state having a materially greater interest and whose law would otherwise govern. *Id.*; *Thomas v. Lytle,* 104 F. Supp. 2d 906, 926-27 (M.D. Tenn. 2000), aff'd, 52 F. App'x 671 (6th Cir. 2002).

§ 22.14 of the Lease.**9** *See generally The Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir. 2003) (noting that, in diversity cases, a district court should apply the choice-of-law provisions of the forum state).

But the district court, citing the "internal affairs" doctrine recognized by the Tennessee courts,**10** applied the law of Delaware, where May-Ridge was formed and incorporated, for the limited purpose of determining whether the allegations in Southeast's complaint sufficiently provided justification to disregard the separate corporate entities of Prime and its subsidiary, May-Ridge, and to pierce May-Ridge's corporate veil.  Southeast now challenges the court's decision to apply Delaware law to its alter ego claim.

According to Southeast, the choice-of-law provision contained in § 22.14 of the Lease cannot be disregarded when it was made in good faith and the state chosen (Tennessee) bears some reasonable relationship to the transaction.  *Goodwin*, 597 S.W.2d at 306.  Plaintiff further disputes the district court's application of the internal affairs doctrine as justification for applying Delaware substantive law to the issue of piercing the corporate veil.  Underlying Southeast's argument that Tennessee, not Delaware, law should apply is its strenuous insistence that Tennessee does not require a plaintiff to prove actual fraud in order to pierce the corporate veil.  Citing *Talkington v. Anchor Gasoline, Inc.*, 829 F. Supp. 505, 514 (M.D. Tenn. 1993)*; Stigall v. Wickes Mach.*, 801 S.W.2d 507, 511 (Tenn. 1990); *Continental Bankers Life Ins. Co. of the South v. The Bank of Alamo*, 578 S.W.2d 625, 632 (Tenn. 1979); and *Boles v. Nat'l. Dev. Co., Inc.*, 175 S.W.3d 226, 236 (Tenn. Ct. App. 2005), app. denied (Tenn. 2005), for the proposition that fraud is but one of several acceptable avenues of recovery in an alter ego action, Southeast maintains that its allegations that Prime exercised complete dominion over May-Ridge and used its control to perpetrate violations of certain "positive legal duties"**11** suffices to state a claim to pierce the corporate veil under Tennessee law.

We initially note that Southeast's argument that fraud is not a required element of an action to pierce the corporate veil under Tennessee law has already been considered and rejected by this court in *IBC Mfg. Co. v. Velsicol Chem. Corp.*, No. 97-5340, 187 F.3d 635, 1999 WL 486615 (6th Cir. July 1, 1999), in which we surveyed Tennessee's case law on this issue (including the principal cases on which Southeast now relies) and concluded that "*Tennessee law still requires an element of fraud in order to pierce a corporate veil.*" *IBC Mfg.*, 1999 WL 486615 at *4 (emphasis added).**12**

---

**9**Section 22.14 of the Lease provides that it "shall be interpreted, construed, applied and enforced in accordance with the laws of the State of Tennessee applicable to contracts between residents of Tennessee which are to be performed entirely within Tennessee . . . ."

**10**"Tennessee has long adhered to the 'internal affairs' doctrine, under which matters involving the internal affairs of a foreign corporation are deemed substantive in nature and 'should be resolved in accordance with the law of the state of incorporation.'" *Hicks v. Lewis*, 148 S.W.3d 80, 84 (Tenn. Ct. App. 2003), app. denied (Tenn. Apr. 5, 2004). *See also Thomas,* 104 F. Supp.2d at 927; *Amberjack Ltd. v. Thompson,* No. 02A01-9512-CV-00281, 1997 WL 613676, at *8-9 (Tenn. Ct. App. Oct. 7, 1997).

**11**Southeast cites Prime's alleged breach of § 21.6 of the Lease and breach of the fiduciary duties which Douglas Vicari and Richard Szymanski (a director and corporate officer of Ridgewood) owed to May-Ridge and Ridgewood as violations of "positive legal duties."

**12**In *IBC Mfg.*, we noted that the first Tennessee case to consider the subject of piercing the corporate veil, *Neese v. Fireman's Fund Ins. Co.*, 386 S.W.2d 918 (Tenn. Ct. App. 1964), did not require proof of fraud.  However, we further noted:

In a subsequent case, the Tennessee Supreme Court disregarded *Neese* and declared that three elements must be proved to permit a subsidiary's veil to be pierced:

*See also Thomas*, 104 F. Supp. 2d at 928 (favorably citing *IBC Mfg.* for the proposition that fraud is a requisite element of a claim to pierce the corporate veil under Tennessee law).

Moreover, insofar as the parties debate whether Southeast must show "actual fraud" or "fraud *per se*," this is largely a matter of semantics under the circumstances, and underscores that the choice-of-law issue is not pivotal, given that under both Delaware and Tennessee law, "*fraud or similar injustice*" must be demonstrated in order to pierce the corporate veil. *See, e.g., Mobil Oil Corp. v. Linear Films, Inc*., 718 F. Supp. 260, 268 (D. Del. 1989) ("[f]raud or something like it is required" under Delaware law to sustain an alter ego claim), and cases cited therein; *LaSalle Nat'l Bank v. Perelman,* 82 F. Supp. 2d 279, 295 (D. Del. 2000) ("In order to prevail on a claim to pierce the corporate veil . . . a plaintiff must prove that the corporate form causes fraud or similar injustice."); *In re Foxmeyer Corp.*, 290 B.R. 229, 236 (D. Del. 2003) (quoting *Mobil Oil Corp.,* 718 F.Supp. at 268, for the proposition that fraud or something akin to it is required), and cases cited therein; *Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc*., 685 A.2d 724, 729 (Del. Super. Ct. 1996) ("[T]he alter ego theory requires that the corporate structure cause fraud or similar injustice[;]" thus, "[m]ere dominion and control of the parent over the subsidiary [alone] will not support alter ego liability."); *Wallace v. Wood,* 752 A.2d 1175, 1184 (Del. Ch. 1999) ("Piercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice. Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.") (footnote and internal quotations omitted)). *Accord Continental Bankers*, 578 S.W.2d at 632 (the control of the parent corporation over the subsidiary "must have been used to commit a fraud or wrong[.]"); *Elec. Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp*., 691 S.W.2d 522, 526 (Tenn. 1985) (quoting the *Continental Bankers* test); *Tenn. Racquetball Investors, Ltd. v. Bell,* 709 S.W.2d 617, 622 (Tenn. Ct. App. 1986) (citing *Continental Bankers* and noting that under an alter ego theory of liability, "mere dominance, standing alone, does not render

---

"(1) The parent corporation, at the time of the transaction complained of, exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.

(2) Such control must have been used to *commit fraud or wrong*, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights.

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of."

*See Continental Bankers Life Ins. Co. v. Bank of Alamo*, 578 S.W.2d 625, 632 (Tenn. 1979) (emphasis added).

Several cases decided after *Continental Bankers* included an element of fraud in the piercing the corporate veil test. *See Schlater v. Haynie*, 833 S.W.2d 919, 926 (Tenn. Ct. App. 1991); *Anderson v. Durbin*, 740 S.W.2d 417, 418 (Tenn. Ct. App. 1987); *Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp*., 691 S.W.2d 522, 526 (Tenn. 1985).

In one abtrusely reasoned, post *Continental Bankers* case, the Tennessee Supreme Court applied *Neese* instead of *Continental Bankers*, *see Stigall v. Wickes Mach*., 801 S.W.2d 507, 510-11 (Tenn. 1990). The *Stigall* court did not specifically renounce *Continental Bankers*, nor did it state that fraud was not a requirement for veil piercing because the element of fraud was not in dispute in the case. *See id.* Accordingly, we believe that Tennessee law still requires an element of fraud in order to pierce a corporate veil.

*IBC Mfg*., 1999 WL 486615 at *4.

[a corporate director] liable for the corporate debts"; "[u]se of control to commit fraud or wrong" is also required to fix liability).**13**

"[T]he requisite injustice or unfairness . . . is also not simple in nature but rather something that is similar in nature to fraud or a sham." *In re Foxmeyer*, 290 B.R. at 236. As succinctly explained by the federal district court, applying Delaware law in *Mobil Oil*:

> Any breach of contract and any tort . . . is, in some sense, an injustice. Obviously this type of "injustice" is not what is contemplated by the common law rule that piercing the corporate veil is appropriate only upon a showing of fraud or something like fraud. *The underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping.*
>
> The law requires that fraud or injustice be found in the defendants' use of the corporate form.

718 F. Supp. at 268-69 (emphasis added). *See also Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical*, No. Civ. A. 19760-NC, 2004 WL 415251, at *4 n.30 (Del. Ch. Mar. 4, 2004) (quoting *Mobil Oil*, 718 F. Supp. at 268). "The 'injustice' must be more than the breach of contract alleged in the complaint . . . or even the burden of bringing the action in another forum." *Outokumpu Eng'g Enters.*, 685 A.2d at 729 (citing *Mobil Oil*, 718 F.Supp. at 268).

> With regard to an alter ego claim under Tennessee law, this court has similarly explained,
>
> [W]e understand [the corporate veil theory] to apply primarily to prevent fraud or other tortious wrongdoing. Plaintiffs have made no allegations of fraud in this case. We do not believe this theory should be expanded to relieve creditors of contractual obligations and limitations of which they were fully aware at the time they entered into a contract.

*Foster Wheeler Energy Corp. v. Metro. Knox Solid Waste Auth., Inc.*, 970 F.2d 199, 203 (6th Cir. 1992) (internal citations omitted).

In both Tennessee and Delaware, "[t]he principle of piercing the fiction of the corporate veil is to be applied with great caution and not precipitately, since there is a presumption of corporate regularity," *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991) (citing 18 Am. Jur. 2d *Corporations*, § 43, p. 842, nn. 79, 80, 81), and "[t]he party wishing to pierce the corporate veil has the burden of presenting facts demonstrating that it is entitled to this equitable relief." *Oceanics Schools, Inc. v. Barbour*, 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003) (citing *Schlater*, 833 S.W.2d at 925). *Accord Wallace*, 752 A.2d at 1183 ("Persuading a Delaware court to disregard the corporate entity is a difficult task.") (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. Civ. A. 1131, 1989 WL 110537, at *6 (Del. Ch. Sept. 19, 1989)).

---

**13**In *Boles,* cited as supporting authority by Southeast, the Tennessee Court of Appeals recently commented that "Tennessee's burden of proof [for an alter ego claim], though substantial, does not require proof of actual fraud." 175 S.W.3d at 236 n.1. We note, however that this brief comment on the topic was made in a footnote with no citation to authority and thus, without further explanation, cannot be interpreted as a variance from the Tennessee precedent which requires proof of fraud or some equivalent wrong.

Beside the indispensable elements of complete dominion and control[14] and the sanction of fraud or injustice by the corporate form, the courts of Tennessee and Delaware also consider certain common, non-exclusive factors in determining whether to disregard the corporate veil. The Delaware courts, for instance, verify exclusivity of control by examining

> whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*In re Foxmeyer Corp.*, 290 B.R. at 235 (quoting *Harco*, 1989 WL 110537 at *4).

The Tennessee courts gauge the necessity of piercing the corporate veil by using comparable factors:

> (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*Oceanics Schools,* 112 S.W.3d at 140 (quoting *FDIC v. Allen*, 584 F. Supp. 386, 397 (E.D. Tenn. 1984)) (internal citations omitted). "It is not necessary that all of these factors weigh in a plaintiff's favor in order to justify the piercing of the corporate veil." *Oceanic Schools,* 112 S.W.3d at 140-41 (citation omitted).

Simply put, given the striking parallels between Delaware and Tennessee law pertaining to the issue of piercing the corporate veil, the choice-of-law question is not outcome-determinative in this case.[15] Under the law of either state, Southeast must sufficiently allege that May-Ridge's corporate form was used to sanction a "fraud or similar injustice" in order to survive Prime's 12(b)(6) motion to dismiss.

---

[14]Under Delaware law, to hold a parent corporation liable for the actions of a subsidiary pursuant to the alter ego doctrine, a plaintiff must demonstrate that the parent corporation exercises "exclusive domination and control" to the point that the subsidiary "no longer ha[s] legal or independent significance of [its] own." *Wallace*, 752 A.2d at 1184 (internal citation and quotation marks omitted). *Accord Continental Bankers*, 578 S.W.2d at 632 ("The parent corporation . . . exercises complete dominion and control over its subsidiary, not only of finances, but of policy and business practice . . . so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.").

[15]The district court, using Delaware law as the basis for its analysis of Southeast's alter ego claim, likewise recognized that "Tennessee law would have compelled a similar result."

IV.

Southeast sets forth numerous allegations ostensibly showing that May-Ridge and Prime acted as a single economic entity and May-Ridge was in fact merely the alter ego of Prime. Southeast avers that "[a]lthough May-Ridge executed the Lease and was nominally the lessee of the Hotels, Prime actually directed and controlled the operation of the Hotels." Comp. ¶ 9. In this regard, Southeast alleges that: the hotels were operated exclusively by employees of Prime, who provided all management, front desk, maintenance, housekeeping, reservations, human resources, and other services necessary to operate the hotels; Prime provided all such services on its own behalf, not pursuant to any management or other agreement with May-Ridge, and without any franchise agreement pertaining to the AmeriSuites hotel chain; Prime bore all the risk of loss associated with the operation of the hotels and stood to benefit from any profits generated by the hotels; from July 9, 2000, through the termination of the lease, Prime purportedly received all revenues generated by the hotels; and, on a weekly basis, Prime "swept" all cash generated by the hotels from the local bank accounts maintained by the hotels and deposited all such funds into Prime's central bank account in New Jersey. Comp. ¶¶ 10, 13.

Southeast further alleges that Prime bypassed the legal operational structure of the hotels by never providing May-Ridge with any capital and by directly paying all of the hotels' vendors and services. Comp. ¶ 11. According to Southeast, "Prime so controlled the finances of May-Ridge that it was actually Prime's tax department which determined whether and to what extent May-Ridge was to pay a franchising fee to Prime in connection with the three AmeriSuites hotels involved in this case." Comp. ¶ 22. In total, Prime allegedly spent $4.2 million in excess of the hotels' revenues to operate the hotels, a sum which was neither a loan to May-Ridge nor an equity contribution. Comp. ¶ 12.

In addition, Southeast avers that Prime's CEO, Attilio Petrocelli, was the person who had the authority to make, and in fact made, all significant decisions on behalf of May-Ridge, including decisions regarding May-Ridge's compliance with the Lease terms, even though he was not an officer or director of May-Ridge. Comp. ¶ 9. Southeast alleges that the decision to default on the Lease was made by Petrocelli, who was advised by Ridgewood's officers, Vicari and Szymanski, to "walk away" from the Lease, even though the latter two individuals did not have the authority to order default or to turn the hotels over to Southeast and testified that they considered only what was in the best interests of Prime. Comp. ¶ 17.

In addition, Southeast alleges that May-Ridge has been rendered insolvent as a result of the default under the Lease and has no assets with which to satisfy its legal obligations to Southeast. Comp. ¶¶ 19, 23. Southeast contends that such insolvency is a direct result of Prime's use of its control of May-Ridge to inadequately capitalize the subsidiary. Comp. ¶¶ 7, 19. Southeast maintains that Prime knew when it established May-Ridge that May-Ridge was going to operate at a loss for a substantial period of time and that it did not have sufficient available assets to meet its projected operating expenses. Comp. ¶ 20. Prime allegedly failed to maintain May-Ridge's net worth equal to one year's base rent in accordance with § 21.6 of the Lease. Comp. ¶ 21.

Finally, with regard to the corporate structure of May-Ridge, Southeast alleges that Prime "set up May-Ridge for the sole purpose of limiting its liability under the Lease." Comp. ¶ 25. Southeast avers that there were neither May-Ridge partnership meetings nor Ridgewood board meetings. Comp. ¶ 24. Prime allegedly exercised "plenary control" over May-Ridge and Ridgewood and used this control: to cause the officers and directors of Ridgewood to violate their duties of loyalty to these entities; to cause May-Ridge to default under the Lease; and to cause May-Ridge and Ridgewood to have inadequate capital with which to finance May-Ridge's foreseeable operating expenses, to the extent that "[n]either May-Ridge nor Ridgewood had any mind or will of its own."

Comp. ¶¶ 24-26.  Southeast concludes that "[t]o adhere to the fiction of May-Ridge's separate corporate existence would promote injustice."  Comp. ¶ 27.

V.

Reviewing these allegations, we agree with the district court that Southeast has stated sufficient facts that, if true, establish the dominion/control component of a claim to pierce the corporate veil.  *Wallace*, 752 A.2d at 1184; *Continental Bankers*, 578 S.W.2d at 632.  Southeast avers with detail that corporate formalities were ignored in various ways, Prime directed day-to-day operations of the hotels and provided all employees and services, Prime financed the operations of the three hotels during the lease period and received and retained all revenues from the hotels, Prime's CEO made all significant decisions on behalf of May-Ridge, and Prime bypassed the legal structure set up to operate the hotels.

However, as previously noted, "[m]ere dominion and control of the parent over the subsidiary will not [alone] support alter ego liability."  *Outokumpu*, 685 A.2d at 730.  *See also Continental Bankers*, 578 S.W.2d at 631 ("to disregard the corporate entities requires, in the case of parent and subsidiary, more than a showing that they have similar corporate names and locations and the exercise of dominion through common officers and directors.").  Likewise, Southeast's allegations that appropriate corporate formalities were not observed by Prime and May-Ridge "standing alone are insufficient for the alter ego theory to operate to pierce the corporate veil." *Mobil Oil*, 718 F. Supp. at 267.

Southeast nonetheless argues that two alleged violations of "positive legal duties" by Prime supply the requisite "fraud or injustice" necessary to complete its alter ego claim:  (1) Prime's failure to provide adequate capital to finance May-Ridge as required by § 21.6 of the Lease (Comp. ¶ 21), and (2) Prime's use of its dominion and "plenary control" over May-Ridge and Ridgewood to "cause the officers and directors of Ridgewood to violate their duties of loyalty to these entities."  Comp. ¶ 26.  In this latter regard, Southeast asserts, in pertinent part, that:

> 17.      The decision to default under the terms of the Lease was made by Prime's chief executive officer, Attilio Petrocelli, who held no position of any kind with May-Ridge or Ridgewood.  Messrs. Vicari and Szymanski, the directors and officers of Ridgewood, recommended to Mr. Petrocelli that the tenant "walk away" from the lease, but neither acting individually nor both acting collectively as the Board of Directors of Ridgewood had the authority to default and turn the Hotels over to the plaintiff.  Further, in recommending to Mr. Petrocelli that May-Ridge default under the terms of the Lease, neither Mr. Vicari nor Mr. Szymanski analyzed or considered what was in the best interests of either May-Ridge or Ridgewood.  Both Mr. Vicari and Mr. Szymanski have testified that they considered only what was in Prime's best interests.

> 18.      Neither Mr. Vicari nor Mr. Szymanski, nor Mr. Petrocelli, for that matter, approached the plaintiff to attempt to renegotiate the terms of the Lease so that May-Ridge could continue to lease the hotels, even though to do so would have been in the best interests of May-Ridge and Ridgewood.

It is significant, however, that Southeast also acknowledges in its complaint that Prime spent approximately $4.2 million in excess of the hotels' revenues to operate the hotels from July 2000 to April 2003.  Comp. ¶ 12.  Southeast avers that, in the wake of the events of September 11, 2001, the performance of the hotels "suffered greatly."  Comp. ¶ 144.  "The revenues which the Hotels generated in 2001 and 2002 did not reach the levels which Prime had projected at the time the Lease

was executed. From July 9, 2000, to the end of calendar year 2002, Prime lost approximately $3.5 million in the operation of the Hotels." *Id.*

In light of these averments, Southeast's premise that it would have been in the best interests of May-Ridge and Ridgewood to renegotiate the Lease and that the officers breached their fiduciary duties to these entities by advising May-Ridge to walk away from the Lease, is not only questionable from a business standpoint, but also is undermined by Southeast's own acknowledgment that the venture was unprofitable. In light of these contradictory assertions contained in the complaint that, on the one hand, the corporate officers breached their fiduciary duties to Ridgewood by recommending that the Lease be terminated and, on the other hand, that there were sound economic reasons to do so, we agree with the district court that the complaint does not plead sufficient facts establishing that the officers breached their fiduciary duties.

More importantly, these conclusory allegations, couched in terms of a contractual breach, are not tantamount to the fraud or injustice required to pierce the corporate veil. As we have already emphasized, "[t]he injustice must be more than the breach of contract alleged in the complaint. . . ." *Outokumpu*, 685 A.2d at 729. Southeast does not plead with specificity that, in making the decision to walk away from the Lease without renegotiating it, Prime and the corporate officers misused the limited liability supplied to Prime by May-Ridge's and Ridgewood's corporate forms to sanction a fraud, injustice, or equivalent misfeasance. Viewing this case from its proper perspective – a consensual contractual agreement between sophisticated parties – we are not persuaded that Southeast has pleaded extraordinary circumstances that justify piercing May-Ridge's corporate veil.[16]

---

[16]As noted in 1 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 41.85:

The alter ego doctrine and its criteria are applicable to impose substantive liability whether that liability is in causes of action in tort, in contract, or both, although mere breach of contract is generally not sufficient to justify a disregard of the corporate entity. In other words, courts usually apply more stringent standards to piercing the corporate veil in a contract case than they do in tort cases. This is because the party seeking relief in a contract case is presumed to have voluntarily and knowingly entered into an agreement with a corporate entity, and is expected to suffer the consequences of the limited liability associated with the corporate business form, while this is not the situation in tort cases. Further, one who has contracted with a selected party and received the promise bargained for should not be allowed to look to another merely because he or she is disappointed in the selected party's performance. Thus, under contract law, the disappointed one may not hold the other liable without additional compelling facts. Generally, courts find these "additional compelling facts" in affiliated corporation cases where the plaintiff has acted to his or her own detriment upon representations made by officers of the parent corporation concerning control and ownership of the subsidiary and the payment of its debts. Also, a finding of fraud is an essential element of an alter ego determination in contract cases, while no finding of fraud is required in tort cases.

[T]he general policy distinction remains that courts are more likely to disregard the corporate entity in tort cases than in cases of contract cases because the injured party in contract cases had the opportunity to select the entity with whom he or she contracted; in a tort case, no such selection is made by a plaintiff. Accordingly, absent very compelling equitable considerations, courts should not rewrite contracts or disturb the allocation of risk the parties have themselves established.

(Footnotes omitted). *See also Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1577 (10th Cir. 1990) (citing Fletcher § 41.85 and noting that "The obvious difference between consensual and nonconsensual transactions is that the claimants in consensual transactions generally have chosen the parties with whom they have dealt and have some ability, through personal guarantees, security agreements, or similar mechanisms, to protect themselves from loss. For example, the fact that a company is undercapitalized can be overcome in many contractual settings, because the parties can allocate the risk of financial failure as they see fit."); *Edwards Co., Inc. v. Monogram Indus., Inc.*, 730 F.2d 977, 981 (5th Cir. 1984) ("The attempt to hold a parent corporation [liable] where the claim asserted is of a contractual origin presents added difficulties. The very reasonable question must be met and answered why one who contracted with the subsidiary and received the promise which he bargained for but who has been disappointed in the fulfillment by the subsidiary of its commitment should be allowed to look to the parent. As a matter of contract right it is evident he may not. Additional

Southeast also avers in its complaint that Prime did not capitalize May-Ridge with sufficient net worth as required by § 21.6 of the Lease, pursuant to which May-Ridge "shall at all times maintain Net Worth . . . in an amount at least equal to the aggregate of one year's Minimum Rent [$2,912,244] payable pursuant to this Agreement[.]" Southeast claims that Prime used its control of May-Ridge to cause this default. Comp. ¶¶ 21, 26. According to Southeast, had the net worth requirement been fulfilled, it could have recovered $2.9 million of its $7.25 million judgment against May-Ridge.

The district court held that this purported violation of a positive legal duty did not rise to the level of "fraud or similar injustice," stating:

> [T]he Court disagrees with Southeast's characterization that May-Ridge was insufficiently capitalized, as the complaint alleges that the hotels operated with sufficient capital and revenues until the date of breach, that May-Ridge and Ridgewood were rendered insolvent "as a result of the default under the terms of the Lease Agreement, and the subsequent termination of the Lease Agreement." (Complaint at ¶¶ 23, 27).

> Nor does the Court find that Southeast was "injured" as a result of this "undercapitalization". * * * Southeast is entitled to retain $3,127,800.00 in 'Retained Funds', which would have counted toward May-Ridge's net worth calculation had Prime assigned those funds to May-Ridge. Even if, as Southeast alleges, those funds were never formally assigned to May-Ridge, Southeast is still entitled to mitigate its damages from May-Ridge's breach of the Lease Agreement by retention of these funds. Thus, even accepting Southeast's allegations as true, the Court fails to discern any concrete injury suffered by Southeast as a result of May-Ridge's "undercapitalization."

Southeast views the court's reasoning as flawed, arguing that, pursuant to § 21.6 of the Lease, the Retained Funds could only be used to satisfy the net-worth requirement if such funds were assigned to May-Ridge; and, because the complaint does not allege such an assignment, Southeast's holding of the Retained Funds therefore does not "mitigate" the damages caused by May-Ridge's violation of the net worth requirement. Curiously, Southeast further asserts in its appellate brief that it "was never paid Retained Funds of $3,127,800" and that "[t]he Retained Funds, although characterized as a deposit, were in fact a rebate of rent to be paid upon expiration of the Lease Agreement."

We, however, find the district court's reasoning to be sound. First, even accepting as true the allegation that Prime caused May-Ridge to breach the Lease's net-worth covenant, we reiterate that allegations pertaining to the mere breach of an underlying contract or undercapitalization, alone, do not warrant piercing the corporate veil in order to hold the parent corporation liable for such breach. *Mobil Oil*, 718 F. Supp. at 268; *Greene v. Hill Home Dev., Inc.*, No. 03A01-9210-CH-00369, 1993 WL 17115, at *3 (Tenn. Ct. App. Jan. 28, 1993) ("Failure of a business venture and resulting loss of capital does not constitute gross under-capitalization as that term is used [to pierce the corporate veil]."). Southeast does not allege that Prime was "involved in an elaborate shell game or [was] otherwise abusing the corporate form to effect a fraud." *Outokumpu Eng'g Enters.*, 685 A.2d at 729. There is no averment that "the corporation [is] a sham and exist[s] for no other purpose than as a vehicle for fraud." *In re Sunstates Corp. Shareholder's Litig.*, 788 A.2d 530, 534 (Del. Ch. 2001) (citation omitted). In the present context involving a contract, Southeast does not allege that

---

compelling facts must appear.") (quoting *Bell Oil & Gas Co. v. Allied Chem. Corp.*, 431 S.W.2d 336, 339-40 (Tex. 1968)).

it was misled at the time the Lease was executed. Indeed, Southeast's acknowledgment that Prime effectively capitalized May-Ridge until the date of the breach – by funding the operations of the hotels from July 2000 through the termination of the Lease and by spending over $4.2 million of its own money during a three-year period, despite significant losses in revenue – contradicts the existence of a fraudulent corporate shell game, and there is no allegation that Prime was ever unjustly enriched as a result of the hotel operations. Thus, the mere alleged breach of the Lease's net-worth covenant does not justify piercing the corporate veil.

Second, Southeast's claim that its receipt of the Retained Funds does not "mitigate" the damages caused by May-Ridge's alleged breach of the net-worth covenant defies the express language of the pertinent Lease provisions. The final clause of the net-worth provision, § 21.6, states that the parties to the Lease "expressly understood and agreed that the right to receive the Retained Funds, if assigned to Tenant, may for such purpose be counted as equity at the full amount thereof." Section 1.81 defines "Retained Funds" as a cash amount equal to $3,127,800, which was in excess of the annual minimum rent of $2,912,244 due under the Lease. Section 3.5 further provides that "Landlord [Southeast] is holding the Retained Funds as security for the faithful observance and performance by Tenant of all the terms, covenants and conditions of this Lease," and that Southeast "may . . . appropriate and apply the entire Retained Funds or so much thereof as may be necessary to compensate Landlord toward the payment of Rent or other sums or loss or damage sustained by Landlord due to such breach on the part of Tenant." These Lease provisions clearly provide that the Retained Funds are to be "counted as equity" in satisfaction of the net-worth covenant. Thus, as the district court properly concluded, Southeast suffered no concrete injury as a result of May-Ridge's alleged under-capitalization.

Further, only if no default occurred would "any unapplied balance of the Retained Funds . . . be paid to Tenant . . . at the end of the Term." Lease § 3.5. Obviously, such an uneventful Lease term did not occur. Thus, any rights that Prime or May-Ridge may have had with respect to the Retained Funds were relinquished when May-Ridge defaulted under the Lease. Southeast's unsupported assertion that the Retained Funds were never paid to it or held as security for the Lease obligations is contrary to the express language of the Lease attached to and incorporated into Southeast's own complaint.

We therefore conclude that Southeast has not alleged extraordinary circumstances that would warrant piercing May-Ridge's corporate veil in order to hold Prime liable for its subsidiary's breach of the Lease. In so holding, we underscore that this is a consensual contract setting in which sophisticated parties negotiated and entered into the Lease with full knowledge of its terms. Prime's limited guaranty of the Lease equal to one year's base rent, contained in § 4.5 of the original purchase agreement, was struck from the amended purchase agreement executed contemporaneously with the Lease. It is readily apparent that, in lieu of such a guaranty, May-Ridge's obligations under the Lease were to be secured by the Retained Funds held by Southeast, as well as by the hotels' personal property.

Under similar circumstances, courts have been justifiably hesitant to pierce the corporate veil and hold a parent company liable for the breach of a commercial lease by its subsidiary or affiliate where the parent did not guarantee the tenant's performance. *See generally* 1 Fletcher Cyc. Priv. Corp. § 41.85. *See also Telecom Int'l Am., Ltd. v. AT & T Corp.,* 280 F.3d 175, 200-01 (2d Cir. 2001) (affirming summary judgment and holding that plaintiff "has no grounds to pierce [parent's] corporate veil" where parent "wanted to limit its potential losses" by creating subsidiary "as a separate entity with only as much capital as then-currently needed," "declined to enter into any agreement with [plaintiff] or to guarantee [subsidiary's] obligations to [plaintiff] under the agreements [subsidiary] signed"); *Schlater,* 833 S.W.2d at 926-27 (disallowing claim to pierce corporate veil where "[p]laintiff's only complaint is that he was unable to collect delinquent rent under a lease with a corporation which became insolvent because of unprofitable operations during

which all of the corporation's assets had been pledged to a bank to obtain operating funds.  This, standing alone, is insufficient to establish liability for the debt against officers, stockholders, or the corporation which was permitted by the bank to use some of the mortgaged assets in an effort to pay the debt from profits of an operation which also proved unprofitable" and where "[t]here is no evidence that [plaintiff] was misled at the time the lease was executed."); *Tenn. Racquetball Investors,* 709 S.W.2d at 622 (dismissing alter ego claim and emphasizing that it was not alleged or shown that "at the time of the creation" of lease "there was any ground to believe that [plaintiff] was in reality dealing" with shareholder; "[o]n the contrary, it was clearly understood that the corporation [] was created specially to deal with plaintiff in lieu of" shareholder); *Greene,* 1993 WL 17115, at *3 (refusing to pierce corporate veil where "plaintiffs knew, at all times, that they were dealing with a corporation and that [its sole shareholder] was acting in his capacity as president. Had they wished to protect themselves against corporate insolvency, they were free to do so. [Plaintiffs] consciously chose not to do so" by "proceeding with the closing of the transaction" even though the owner/president had declined to sign in his individual capacity).

For the foregoing reasons, we conclude that Southeast has failed as a matter of law to state a claim to pierce May-Ridge's corporate veil.  We therefore affirm the dismissal of Southeast's claims.

Affirmed.

---

**DUBITANTE**

---

LOUIS F. OBERDORFER, District Judge, dubitante.  Plaintiff is a Tennessee corporation with its principal place of business there.  It brought this action in a Tennessee state court claiming that Defendant, Prime Hospitality Corporation (a Delaware corporation), caused a related entity, May-Ridge, L.P. (also a Delaware entity), to break a lease between Plaintiff and May-Ridge.  A clause in that lease expressed the intention of Plaintiff and May-Ridge that Tennessee law apply to any disputes regarding the "interpret[ation], constru[ction], appli[cation], and enforce[ment]" of the lease.  Lease § 22.14 (JA 83-84).  As a federal court sitting in diversity, we are obligated to apply Tennessee choice of law principles in selecting the law applicable to the present dispute.  *See Mill's Pride, Inc. v. Continental Ins. Co.*, 300 F.3d 701, 704 (6th Cir. 2002).

I am not confident as to Tennessee law on two issues presented by this case: (1) Whether Tennessee choice of law principles direct the selection of Tennessee or Delaware law for the determination of whether Plaintiff may pierce the "corporate veil" of May-Ridge and its general partner, Ridgewood Holding Corporation? and (2) What is Tennessee law on the veil-piercing issue?

With respect to choice of law, I start with the expression by Plaintiff and May-Ridge of an intention to be guided by Tennessee law with respect to issues regarding the "interpret[ation], constru[ction], appli[cation], and enforce[ment]" of the lease.  Lease § 22.14 (JA 83-84).  From that statement, it may be reasonably inferred that the parties generally preferred Tennessee law.  In addition, I find no clear default rule among Tennessee choice of law principles.  Some intermediate Tennessee courts have applied forum law in determining whether a plaintiff may pierce a corporate veil.  *See, e.g.*, *Boles v. National Dev. Co., Inc.*, 175 S.W.3d 226, 236-38 (Tenn. Ct. App. 2005); *Oceanics Sch., Inc. v. Barbour*, 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003).  Other intermediate Tennessee courts have applied the law of the place of registration of the entity the corporate veil of which is to be pierced.  *See, e.g.*, *Hicks v. Lewis*, 148 S.W.3d 80, 84 (Tenn. Ct. App. 2003); *Amberjack, Ltd., Inc. v. Thompson*, 1997 WL 613676, at *8-9 (Tenn. Ct. App. Oct. 7, 1997).  The Tennessee Supreme Court apparently has not resolved this conflict.

My colleagues finesse the choice of law issue by concluding that the corporate veil piercing stance of Delaware law is not, for purposes of this case, materially different from that of Tennessee law.  I am not persuaded that this is the case.

Delaware law requires proof of "fraud or similar injustice" to pierce a corporate veil in circumstances similar to those here.  *E.g.*, *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) ("Piercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice."); *Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del. Sup. Ct. 1996) ("[T]he alter ego theory requires that the corporate structure cause fraud or similar injustice.").

The Tennessee standard appears to be less stringent.  In *Continental Bankers*, the Tennessee Supreme Court required for the piercing of a corporate veil in circumstances similar to those here only that a parent have used its control of its subsidiary(ies) "to commit fraud *or wrong*, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act." *Continental Bankers Life Ins. Co. of the South v. Bank of Alamo*, 578 S.W.2d 625, 632 (Tenn. 1979) (emphasis added).  An unpublished decision of this circuit (and a federal district court decision relying on that decision), applying Tennessee law, invokes a more restrictive standard – a standard even more restrictive than that of Delaware law.  *See IBC Mfg. Co. v. Velsicol Chem. Corp.*, 1999 WL 486615, at *3-4 (6th Cir. July 1, 1999) (unpublished disposition) (requiring a showing of fraud

itself); *Thomas v. Lytle*, 104 F. Supp. 2d 906, 928 (M.D. Tenn. 2000) (same). But the Tennessee Supreme Court has not abandoned the twenty-six year old *Continental Bankers* standard, nor given much, if any, indication of an intention to do so. *See Stigall v. Wickes Mach.*, 801 S.W.2d 507, 510-11 (Tenn. 1990); *Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985). Our duty is to ascertain currently applicable Tennessee law (i.e., Tennessee law as today's Tennessee Supreme Court would apply it). *See Commissioner of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 464-465 (1967).

My colleagues have ventured into the uncertainty of Tennessee law and have ruled on it. They may very well be correct in concluding that the Tennessee Supreme Court would adopt and apply a "fraud or similar injustice" standard a la Delaware. But the Tennessee Supreme Court has a rule that it "may, at its discretion, answer questions certified to it by . . . a Court of Appeals of the United States." Tenn. Supr. Ct. R. 23.

Considerations of comity and common sense persuade me that we should accept the Tennessee Supreme Court invitation and certify to it two Tennessee law questions: (1) "Which state's law applies to Plaintiff's efforts to hold Defendant liable for May-Ridge's breach of the relevant lease?" and (2) "If Tennessee law applies, has Plaintiff alleged sufficiently inequitable conduct to justify piercing the 'corporate veils' of May-Ridge and its general partner Ridgewood?"