OPINION
{¶ 1} Appellants, James Minno, et al. (hereinafter referred to as "Mr. Minno")[1], appeal from the Trumbull County Court of Common Pleas' judgment entry granting *Page 2 
appellee Pro-Fab, Inc.'s ("Pro-Fab") motion for summary judgment. For the reasons that follow, we reverse.
 {¶ 2} This appeal stems from an accident that occurred on September 24, 2003, at the Newton Falls Elementary School Project ("Newton Falls Project") when Mr. Minno, while performing his duties as an ironworker, fell from a nineteen foot wall and sustained serious injuries, which rendered him paraplegic.
 {¶ 3} The Parties
 {¶ 4} Hummel Construction Company ("Hummel") was the general contractor for the Newton Falls Project. Because Hummel filed and was granted summary judgment in its favor, Hummel is not a party to this appeal.
 {¶ 5} Pro-Fab was awarded the subcontract work for the steel erection portion of the project. Pro-Fab in turn subcontracted this steel work to defendant See-Ann, Inc. ("See-Ann") who shares corporate ownership and offices with Pro-Fab. The exact relationship between Pro-Fab and See-Ann is disputed and is at issue in this appeal. Mr. Minno contends that Pro-Fab is the "alter-ego" of See-Ann and is vicariously liable for his injuries. However, Pro-Fab considers the two companies to be separate legal entities, akin to a "brother-sister" relationship. Mr. Minno was paid by See-Ann and was considered by See-Ann to be its employee.
 {¶ 6} The Underlying Accident
 {¶ 7} Mr. Minno had been working on the job site for three weeks prior to his accident doing prep work, which involved welding pieces of steel onto joists. On the day of the accident, Mr. Minno's responsibility was to weld I-beams brought in by a crane onto the east block wall of the newly built structure. While doing this work Mr. *Page 3 
Minno was sitting on the east wall and was using a welding stinger that was connected to a welding unit attached to a truck on the north side of the building. The stinger was attached to a cable and cable connectors so that it could operate a distance from the welding unit. Mr. Minno said that the welding leads, or copper cables that were connected to the welding machine, kept coming apart. Mr. Minno described the leads as being cheaply made and smaller than those he usually used on a construction site.
 {¶ 8} Mr. Minno had successfully welded two I-beams into their connection. As he moved to the third beam he repositioned the cable. The connector that attaches to the welding lead connection to the cable came apart, causing Mr. Minno to lose his balance. As a result, Mr. Minno fell off the nineteen foot high wall and landed face down onto a lower foundation wall. Mr. Minno was rendered paraplegic.
 {¶ 9} Lack of Safety Precautions
 {¶ 10} Mr. Minno was not wearing any fall protective equipment. Mr. Minno's foreman, Donald Fisher, conceded that he did not offer Mr. Minno any fall protection equipment because he did not believe it was necessary or that it was a safety violation. Mr. Fisher mistakenly thought that fall protection was only required while working at heights greater than twenty-five feet, when in fact 29 CFR 1926.760 requires such protection at heights greater than fifteen feet. Although lanyards and harnesses were kept in Mr. Fisher's truck, they were not brought out that day. Nor was an aerial lift used that day, although Mr. Minno felt there should have been one. Mr. Minno conceded that in 90% of his past jobs, he would have been tied off in order to prevent a fall. However, he felt that it was more dangerous to tie off during that job because of the proximity of *Page 4 
the crane. Mr. Fisher agreed that there was nowhere for Mr. Minno to tie himself off when he was sitting on the wall.
 {¶ 11} Post-Accident Investigation
 {¶ 12} The day following the accident, See-Ann hired Safety Resources Co. of Ohio, Inc. ("Safety Resources"), the company that also provides See-Ann with safety training, to investigate the accident. Safety Resources determined that Mr. Minno's fall was caused by his failure to wear fall protective equipment and due to the failure of the stinger lead connection, which did not allow for a secure connection and came apart too easily. Safety Resources recommended that workers be re-trained on hazard assessment techniques, on fall protection and welding connector use; that old welding components be maintained and removed if damaged; and that a written fall protection plan be devised.
 {¶ 13} Procedural History
 {¶ 14} Mr. Minno initially filed a complaint against Hummel, Pro-Fab and See-Ann. In the original complaint, Mr. Minno alleged that he was an employee of See-Ann and that See-Ann failed to take adequate safety measures to ensure his safety. He alleged negligence and intentional tort theories of recovery.
 {¶ 15} Mr. Minno subsequently filed an amended complaint in which he alleged that he was working for See-Ann but under the direction and control of Pro-Fab. He also alleged inter alia that Pro-Fab was in control of the work vicinity, and that Pro-Fab was the "alter-ego" of See-Ann and was vicariously liable for his injuries.
 {¶ 16} Both Pro-Fab and See-Ann filed motions for summary judgment. The trial court denied See-Ann's motion for summary judgment on the ground that genuine *Page 5 
issues of material fact remain as to whether See-Ann committed an intentional tort against Mr. Minno. Therefore, Mr. Minno's claim against See-Ann remains pending in the trial court. However, the trial court granted Pro-Fab's motion for summary judgment, finding that Pro-Fab was the "sister" corporation of See-Ann and that Mr. Minno worked for See-Ann, not Pro-Fab. As such, the court held that Pro-Fab was not liable for Mr. Minno's injuries because it did not actively participate in or exercise any dominion or control over Mr. Minno in the performance of his job duties.[2]
 {¶ 17} Mr. Minno filed the instant appeal, raising one assignment of error for our review:
 {¶ 18} "The trial court erred in granting appellee's motion for summary judgment because they are the "alter ego" company of See-Ann, Inc. whose motion for summary judgment was denied."
 {¶ 19} Standard of Review
 {¶ 20} Mr. Minno contends that the court erred in granting summary judgment for Pro-Fab. Summary judgment is appropriate under Civ.R. 56(C) when (1) there is no genuine issue of material fact remaining to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence in favor of the nonmoving party, that conclusion favors the moving party. Temple v. WeanUnited, Inc. (1977), 50 Ohio St.2d 317, 327.
 {¶ 21} "This court reviews de novo a trial court's order granting summary judgment." Hudspath v. Cafaro Co., 11th Dist. No. 2004-A-0073,2005-Ohio-6911, ¶ 8, citing Hagood v. Conrad, 11th Dist. No. 2000-T-0058, 2002-Ohio-3363, ¶ 13. "A *Page 6 
reviewing court will apply the same standard a trial court is required to apply, which is to determine whether any genuine issues of material fact exist and whether the moving party is entitled to judgment as a matter of law." Id.
 {¶ 22} "Since summary judgment denies the party his or her `day in court' it is not to be viewed lightly as docket control or as a `little trial.' The jurisprudence of summary judgment standards has placed burdens on both the moving and the nonmoving party. In Dresher v.Burt, the Supreme Court of Ohio held that the moving party seeking summary judgment bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record before the trial court that demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim. The evidence must be in the record or the motion cannot succeed. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case but must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) that affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. If the moving party has satisfied its initial burden, the nonmoving party has a reciprocal burden outlined in the last sentence of Civ.R. 56(E) to set forth specific facts showing there is a genuine issue for trial. If the nonmoving party fails to do so, summary judgment, if appropriate shall be entered against the nonmoving party based on the principles that have been firmly established in Ohio for quite some time in Misteff v.Wheeler (1988), 38 Ohio St.3d 112." Welch v. Ziccarelli, 11th Dist. No. 2006-L-229, 2007-Ohio-4374, at ¶ 40. *Page 7 
 {¶ 23} "The court in Dresher went on to say that paragraph three of the syllabus in Wing v. Anchor Media, Ltd. of Texas (1991),59 Ohio St.3d 108, is too broad and fails to account for the burden Civ.R. 56 places upon a moving party. The court, therefore, limited paragraph three of the syllabus in Wing to bring it into conformity withMisteff. (Emphasis added.)" Id. at ¶ 41.
 {¶ 24} The Supreme Court in Dresher went on to hold that whenneither the moving nor nonmoving party provides evidentiary materials demonstrating that there are no material facts in dispute, the moving party is not entitled a judgment as a matter of law as the moving party bears the initial responsibility of informing the trial court of the basis for the motion, "and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim. Id. at 276. (Emphasis added.)" Id. at ¶ 42.
 {¶ 25} Piercing the Corporate Veil
 {¶ 26} The issue presented in this appeal is whether Pro-Fab and See-Ann are separate entities as a matter of law or whether a fact issue remains as to whether Pro-Fab is essentially the alter-ego of See-Ann and subject to liability for Mr. Minno's injuries. Mr. Minno's argument is based upon the "piercing the corporate veil" theory of liability. It is Mr. Minno's position that Pro-Fab and See-Ann were for all intents and purposes acting as one entity and should be regarded as one.
 {¶ 27} "Piercing the corporate veil is not a claim, it is a remedy encompassed within a claim." Geier v. National GG Industries, Inc. (Dec. 23, 1999), 11th Dist. No. 98-L-172, 1999 Ohio App. LEXIS 6263, at 10. Piercing the corporate veil has different types of application. The most common situation is where individual shareholders are *Page 8 
held liable for wrongs committed by the corporation. Id. at 7-8. In addition, the corporate veil may be pierced where two corporations are owned by the same shareholders but where the two corporations are "fundamentally indistinguishable" and are in effect deemed a single entity. Clinical Components, Inc. v. Leffler, 9th Dist. No. 95CA0085, 1997 Ohio App. LEXIS 199, at 8.
 {¶ 28} The general rule is that "`a parent corporation is not liable for the actions of its subsidiary, even if the subsidiary is wholly owned by the parent corporation." Wallace v. Shelly and Sands,Inc., 7th Dist. No. 04 BE 11, 2005-Ohio-1345, at ¶ 37, citingStarner v. Guardian Industries (2001), 143 Ohio App.3d 461, 468. "This is because a corporation is a legal entity, apart from those who compose it. Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos.,Inc. (1993), 67 Ohio St.3d 274, 287." Id. However, "the corporate entity may be disregarded and its subsidiary may be treated as a single entity under certain circumstances." Id., citing Starner at 468-469. The underlying rationale behind piercing the corporate veil is to prevent shareholders or parent and subsidiary corporations to hide behind the fictional entity of the corporation where evidence of harm, injustice or fundamental unfairness has been presented. Clinical Components at 7, citing Belvedere at 287.
 {¶ 29} In order to "pierce the corporate veil," the Ohio Supreme Court in Belvedere set forth the factual considerations for determining whether a parent corporation is liable for the torts of its subsidiary. Under Belvedere, the corporate fiction is to be disregarded when there exists: "(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in *Page 9 
such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong."Belvedere at 289. In determining whether the factors underBelvedere have been met or whether sufficient evidence has been presented to raise genuine issues of material fact, we are mindful that piercing the corporate veil is primarily a matter for the trier of fact.Clinical Components at 8.
 {¶ 30} Mr. Minno contends that he has presented sufficient evidence to create a fact issue regarding whether the corporate veil should be pierced and whether he can attempt to impose liability on Pro-Fab. Each factor of the Belvedere three-pronged test will be addressed separately to determine whether a fact issue does indeed remain.
 {¶ 31} Whether the two entities are separate or are a mereinstrumentality of the other
 {¶ 32} The first prong in Belvedere requires Mr. Minno to present sufficient evidence to show that Pro-Fab exerted such control over See-Ann so that See-Ann had "no separate mind, will, or existence of its own * * *." Belvedere at 288. "The first prong of Belvedere has been referred to as the `alter ego doctrine,' and, in order to succeed under this prong, `a plaintiff must show that [the two corporations] are fundamentally indistinguishable.'" Siva v. 1138 LLC, 10th Dist. No. 06AP-959, 2007-Ohio-4667, at ¶ 10.
 {¶ 33} To support his argument that the two entities are essentially one and the
same, Mr. Minno points to the fact that they have substantially identical management, business, purpose, equipment, customers, supervision, operation and ownership. Pro-Fab, while conceding that the two entities share officers and have the same corporate address, nevertheless maintains that the two entities are separate, were incorporated *Page 10 
on different dates and that its relationship with See-Ann is akin to a "brother sister" relationship. Furthermore, Pro-Fab contends that it has no ownership interest in See-Ann and therefore cannot exert any control over See-Ann. For support, Pro-Fab relies on Enwotwen Industries, Inc.v. Brookstone Ltd. Partnership, S. Dist. Ohio No. 93-50475,157 B.R. 374, which held that there could be no piercing of the corporate veil where there was no domineering entity and where the only common element between the two corporations was common ownership.
 {¶ 34} We agree that whether both entities shared management and personnel does not in and of itself satisfy the first prong inBelvedere. "For purposes of disregarding the corporate form, Ohio law permits one corporation to own all the stock of another corporation as well as to employ common officers and directors, as well as other personnel, without risking * * * liability." Clinical Components at 8. However, where there is other evidence showing that the two entities are not separate but share "unity of interest and ownership," then the first prong may be satisfied. Flynn v. Greg Anthony Construction Co., 6th Cir. No. 01-3391, 2003 U.S. App. LEXIS 23024, at 32.
 {¶ 35} In Flynn, the plaintiffs, trustees of a multiemployer benefit plan, sought to hold the defendant companies derivatively liable for the delinquent contributions by defendant, Greg Anthony Construction. The Sixth Circuit Court of Appeals, applying Ohio law, held that the plaintiffs established a prima facie case of alter-ego liability and found determinative the following factors in making its decision:
 {¶ 36} "Viewing [defendant] Columbus Masonry operations in tandem with Greg Anthony Construction raises the suspicion that these two businesses are in fact one business, separated only in form. * * * Anthony Construction and Columbus Masonry *Page 11 
share the same management and supervision — as evidenced by sharing the same president and treasurer and by a Greg Anthony Construction manager's offer of Columbus Masonry services. They operate from the exact same location, using the same phone lines and office materials. At times, Columbus Masonry and Greg Anthony Construction have been known to share assets, including construction equipment and trucks. Further, they are engaged in the very same industry — masonry subcontracting — and on at least one occasion they interchanged their services on the same job. * * * [Defendant] Pezzo Builders, like Columbus Masonry, is commonly controlled by those officers who also control Greg Anthony Construction and Columbus Masonry. Moreover, Pezzo Builders shares a business location with Columbus Masonry and Greg Anthony Construction and is incorporated to engage in a similar construction business. * * * Thus, the facts alleged for Pezzo Builders and Columbus Masonry established the first requirement of the alter-ego test — complete `unity of interest and ownership' such that the corporations do not have `separate personalities.'"
 {¶ 37} The evidence in this case establishes that the two entities shared more than common ownership and officers. They also shared the same business address and had the same corporate business and purpose, i.e. "to perform structural and miscellaneous steel erection." The fact that the two entities were incorporated on different dates does not mean that they are separate and distinct entities as a matter of law. Of particular significance is the history behind the ownership of the two companies. Initially, under prior ownership, Pro-Fab was engaged in the steel erection and fabrication business. However, current vice-president and secretary of both businesses, Monroe Townsend, testified that he was working for Pro-Fab when he *Page 12 
founded See-Ann at the time Pro-Fab decided to get out of the steel erection business. Subsequently, Mr. Townsend purchased Pro-Fab and decided to have Pro-Fab get back into the erection business. Thus, at some point after there was common ownership of both companies, their functions became more indistingushable.
 {¶ 38} This is also reflected in the fact that some of the companies' employees, such as foremen, commonly work for both entities depending on the particular job.[3]Moreover, safety training is combined for both entities and both companies share a similar written safety and loss control program. Tools and supplies are also shared, and according to Mike Firth, who was employed as a foreman for both companies, Pro-Fab provides the welding equipment used on the jobs for both Pro-Fab and See-Ann.
 {¶ 39} We find that the facts are similar to those present in theFlynn case. Because evidence was presented to show that the companies share common management and employees, and have common safety training and share welding equipment, we are unwilling to hold as a matter of law that the entities are separate, regardless of how the companies characterize themselves. When construing the evidence in a light most favorable to Mr. Minno, we find that sufficient evidence has been presented to raise a fact issue on the first prong of theBelvedere three-pronged test.
 {¶ 40} Whether dominion or control were used to commit a fraud orwrong
 {¶ 41} Under the second Belvedere prong, Mr. Minno must show that Pro-Fab "exercised the control established under the first prong of the test to commit fraud or *Page 13 
other wrongful conduct."[4] Stypula v. Chandler, 11th Dist. No. 2002-G-2468, 2003-Ohio-6413, at ¶ 19; Siva, at ¶ 10. (Citations omitted.) We have interpreted the language "fraud or illegal act" in the broader sense to mean that it also encompasses "those acts that would lead to unfair or inequitable consequences." Id. We have also stressed that the test in Belvedere "is open-ended and versatile, i.e., it permits and encourages flexibility by its very definition." MusicExpress Broadcasting Corp. v. Aloha Sports, Inc., 161 Ohio App.3d 737,2005-Ohio-3401, at ¶ 19.
 {¶ 42} This interpretation comports with the underlying rationale behind piercing the corporate veil. As we stressed in Stypula, a case involving piercing of the corporate veil with regard to individual shareholder liability: "[T]he `veil' of the corporation can be `pierced' and individual shareholders held liable for corporate misdeeds when it would be unjust to allow the shareholders to hide behind the fiction of the corporate entity." Id. at ¶ 20, citing Wiencek v. Atcole Co.,Inc. (1996), 109 Ohio App.3d 240, 287. Thus, in Stypula, we found that this prong was satisfied when the sole shareholder of a company made the decision to close the company after the plaintiff had received a judgment against the company. Under those circumstances, we held that depriving the plaintiff of the ability to enforce his judgment was "an inequitable result, and an intent and purpose for which the corporate fiction cannot be used." Id. at ¶ 22.
 {¶ 43} The same conclusion should be reached in this case. We have already determined under the first prong that there was sufficient evidence of control by Pro-Fab *Page 14 
over See-Ann to withstand a motion for summary judgment. Nevertheless, Pro-Fab repeatedly argues, without any support, that "[a]n ownership interest would be required in order to control See-Ann's actions." Thus, according to Pro-Fab there can be no piercing of the corporate veil where it has no ownership interest in See-Ann. Furthermore, Pro-Fab contends that Mr. Minno was essentially trying to hold the individual shareholders responsible but cannot do so since he has not asserted a claim against the individual shareholders. Pro-Fab's arguments are completely without legal support or merit.
 {¶ 44} Mr. Minno does not seek to hold the individual shareholders personally liable. However, whether one is attempting to pierce the corporate veil by holding individual shareholders liable or by holding a related company liable under alter-ego principles is a distinction without a difference. In either case, the question of control is not dependent upon ownership. As the court stated in Labadie Coal Co. v.Black (U.S. App. D.C. 1982), 672 F.2d 92, 97, a case in which private shareholders were alleged to control the corporation, the question is "whether the corporation, rather than being a distinct, responsible entity, is in fact the alter ego or business conduit of the personin control. In many instances, the person `controlling' a close corporation is also the sole, or at least a dominant shareholder. In other cases the controlling person may seek to avoid personal liability by not formally becoming a shareholder in the corporation. The questionis one of control, not merely paper ownership." (Emphasis added.) Thus, since we have determined that there was a sufficient showing of control to overcome summary judgment, we reject Pro-Fab's arguments. *Page 15 
 {¶ 45} With respect to whether Pro-Fab has used the corporate fiction to commit a fraud, wrong, or inequitable result, Mr. Minno claims that Pro-Fab has done so by subcontracting its work to See-Ann, an entity that admitted in its response to request for production of documents that it carried no liability insurance. In essence, Mr. Minno contends that Pro-Fab, which does carry insurance, is the company holding the most assets and subcontracted the job to See-Ann to relieve itself from liability. Pro-Fab, however, says there is no proof on this point, and furthermore that it did not have control over See-Ann.
 {¶ 46} With respect to the allegation that See-Ann did not carry liability insurance, Pro-Fab attempts to argue that it committed no wrong because there was no evidence to show that the lack of insurance caused See-Ann to be undercapitalized nor was there proof that Pro-Fab was the company with the most assets. However, we believe that the lack of liability insurance, at the least, raises a genuine issue of fact on this second prong, especially in light of the fact that the Subcontract for Building Construction between Hummel and Pro-Fab required insurance at Article 13 and it would appear that this requirement was circumvented by the subsequent subcontract to See-Ann.
 {¶ 47} Piercing of the corporate veil has been implemented to remedy precisely the situation that is evident here, i.e. to disallow a "parent corporation, as the alter ego of the subsidiary company, * * * to avoid liability for the subsidiaries misdeeds * * * or its obligations."Tavern for Tots, Inc. v. City of Toledo, N.Dist. Ohio Case No. 3:04CV7030, 307 F. Supp.2d 933, at 941. Here, the unfairness and injustice are obvious. The evidence, when construed in a light most favorable to Mr. Minno, shows that Pro-Fab, regardless of how it designates itself in relationship to See-Ann, knowingly *Page 16 
subcontracted dangerous work to See-Ann knowing full-well that See-Ann carries no liability insurance. In fact, the decision to subcontract this work was made by Pro-Fab's officers, the same officers for See-Ann. A logical conclusion is that Pro-Fab did this to insulate itself from liability. We find that a genuine issue of fact remains on this point.
 {¶ 48} Whether injury or unjust loss resulted from such control andwrong
 {¶ 49} The third prong of Belvedere, proof that injury or loss resulted, "is causal in nature; that is, it requires the claimant to demonstrate a causal connection between the [corporation's] control * * * and the alleged injury or loss." Music Express Broad. Corp. v. AlohaSports, Inc., 161 Ohio App.3d 737, 2005-Ohio-3401, at ¶ 35. Again, we find there has been sufficient evidence to create a fact issue on this point. The evidence establishes that Pro-Fab intentionally awarded its subcontract work to See-Ann with the knowledge that See-Ann carried no liability insurance. Under these circumstances, there is a causal connection between Pro-Fab's control and award of the job to See-Ann and the resultant injury and loss to Mr. Minno that arises from the complete failure of See-Ann to carry liability insurance.
 {¶ 50} Nevertheless, Pro-Fab argues that this prong cannot be satisfied because it never actively participated in Mr. Minno's work and cannot be responsible for his injuries. Pro-Fab's argument is disingenuous at best. The law regarding active participation applies in the context where one is trying to hold the general contractor liable for the injuries sustained by the employee of a subcontractor. Bond v.Howard Corp. (1995), 72 Ohio St.3d 332. In those circumstances, the plaintiff must prove that either the general contractor directed the activity that resulted in the injury or retained control over a critical variable in the work environment. Id. at 337; Sopkovich v. Ohio *Page 17 Edison Co., 81 Ohio St. 3d 628, 642-643. The inherent flaw with Pro-Fab's argument is that Mr. Minno is not arguing liability based upon the contention that Pro-Fab is the general contractor and that See-Ann is the subcontractor. Instead, Mr. Minno maintains that under the alter-ego/piercing the corporate veil theories Pro-Fab and See-Ann are essentially one entity and that Pro-Fab is liable for his injuries under those theories. Under these circumstances, we reject Pro-Fab's arguments regarding whether there was any evidence of active participation on its part since this is not as issue.
 {¶ 51} For the above reasons, we find that the trial court erred in granting Pro-Fab's motion for summary judgment. Genuine issues of material fact remain regarding whether Pro-Fab is the alter-ego of See-Ann and whether it can be vicariously liable for Mr. Minno's injuries.
 {¶ 52} The judgment of the Trumbull County Court of Common Pleas is reversed and this case is hereby remanded for further proceedings.
[1] Also named as plaintiffs were Mr. Minno's wife, Ruth Minno, and his two children, Amy Byrns, fka Minno and James Minno, Jr., a minor.
[2] The trial court also held that Hummel did not actively participate in Mr. Minno's work duties.
[3] Pro-Fab does not however perform work in the jurisdiction of Local 207.
[4] Mr. Minno initially argues that he need not prove fraud or a wrong because this requirement only applies to contract cases, not to cases where the underlying claim sounds in tort. For support, Mr. Minno relies on the decision of Southeast Tex. Inns. Inc. v. Prime HospitalityCorp. (6th Cir. 2006), 462 F.3d 666. However, that case relied on Tennessee law, and consequently has little precedential value. Rather, we are bound by the Supreme Court of Ohio's decision ofBelvedere, which explicitly sets forth the necessity that there must be a wrongful act committed by the entity in control. TheBelvedere decision does not differentiate between whether the underlying claim sounds in contract or tort law.
COLLEEN MARY OTOOLE, J., concurs,
DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.