RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0003p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

EPLET, LLC; RACER PROPERTIES LLC,

> *Plaintiffs-Appellants*,

*v.*

DTE PONTIAC NORTH, LLC; DTE ENERGY SERVICES, INC.,

> *Defendants-Appellees*.

No. 20-1434

─────────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:17-cv-11462—Stephen J. Murphy, III, District Judge.

Argued: December 2, 2020

Decided and Filed: January 5, 2021

Before: MOORE, GILMAN, and GRIFFIN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Richard B. Phillips, Jr., THOMPSON & KNIGHT LLP, Dallas, Texas, for Appellants. Peter S. Partee, Sr., HUNTON ANDREWS KURTH LLP, New York, New York, for Appellees. **ON BRIEF:** Richard B. Phillips, Jr., Michael V. Blumenthal, Bruce J. Zabarauskas, THOMPSON & KNIGHT LLP, Dallas, Texas, Frances Belzer Wilson, DAWDA, MANN, MULCAHY & SADLER, PLC, Bloomfield Hills, Michigan, for Appellants. Peter S. Partee, Sr., Robert A. Rich, HUNTON ANDREWS KURTH LLP, New York, New York, Joel C. Bryant, MILLER, CANFIELD, PADDOCK & STONE, P.L.C., Ann Arbor, Michigan, for Appellees.

---

**OPINION**

---

GRIFFIN, Circuit Judge.

This alleged breach-of-contract case arises out of General Motors's ("GM") bankruptcy. In 2007, GM sold a power plant to an energy company, DTE Energy Pontiac North, LLC ("DTEPN"). GM also leased the land under the plant to DTEPN for ten years. For its part, DTEPN agreed to sell utilities produced at the plant to GM, to maintain the plant according to specific criteria, and to take care of any environmental issues caused by the plant. DTEPN's parent company, DTE Energy Services, Inc., ("DTE Energy")[1] guaranteed that DTEPN would meet GM's utility needs and its environmental and maintenance responsibilities, or DTE Energy itself would step in to fulfill DTEPN's obligations.

Two years later, GM filed for bankruptcy. GM and DTEPN agreed to GM's rejection of the above contracts, but DTEPN exercised its right as a tenant to continue occupying the power plant's grounds. As part of GM's reorganization, an environmental trust was created to assume ownership of some of GM's industrial property, including the land occupied by DTEPN.

DTEPN remained in possession of the premises until the lease expired. At that time, DTEPN turned the land over to the trust, which discovered that DTEPN had allowed the power plant to fall into disrepair and contaminate the trust's property. The trust sued DTEPN and DTE Energy for breach of contract and various other claims.

The trust's claims against DTEPN are not before us. Instead, we focus on the trust's attempts to hold DTE Energy responsible for its subsidiary's alleged wrongs. As relevant here, the district court dismissed the claims against DTE Energy because (1) the trust's allegations did not support piercing the corporate veil under Michigan law, and (2) DTE Energy's guaranty terminated after GM rejected the associated contracts in bankruptcy. We conclude that the district court erred in both of its rulings. Accordingly, we **REVERSE** the district court's

---

[1]We refer to DTEPN and DTE Energy collectively as "Defendants."

dismissal of Plaintiffs' amended complaint regarding DTE Energy; **REVERSE** the district court's dismissal of Plaintiffs' breach-of-Associated-Agreements claim regarding DTE Energy; and **REMAND** to the district court for proceedings consistent with this opinion.

I.

A.

GM owned a power plant ("the Powerhouse"), which provided steam, compressed air, and electricity to one of its factories in Pontiac, Michigan. In 2007, GM, DTEPN, and DTE Energy entered into five contracts concerning the Powerhouse's future: (1) an asset purchase agreement wherein DTEPN purchased the Powerhouse and its generation equipment; (2) a ten-year lease of the land under the Powerhouse to DTEPN; (3) a utility services agreement wherein DTEPN agreed to supply utilities to GM and to adhere to certain maintenance and environmental covenants; (4) a guaranty from DTE Energy that DTEPN would fulfill all of its obligations arising from the utility services agreement; and (5) an environmental indemnity agreement wherein DTEPN agreed to indemnify GM for any environmental damage caused by its operation of the Powerhouse. We refer to three of these contracts (the asset purchase agreement, the lease, and the utility services agreement) collectively as the "Associated Agreements." When referring to all five contracts, we use the term "Project Contracts."

The Associated Agreements each contained a provision confirming that the Project Contracts were executed as part of a single "integrated" transaction, and that each agreement was vital to the others:

> This Agreement and the other Project Contracts collectively memorialize one integrated transaction that has been set forth in multiple agreements for organizational convenience only. Each Party acknowledges and agrees that each Project Contract is vital to the operation of such transaction and that it would not have entered into any of the Project Contracts if each of the other Project Contracts had not been entered into as well.

Under the asset purchase agreement, GM sold the Powerhouse and its equipment to DTEPN for $2 million. The Powerhouse included, among other things, the building's structure,

a coal-fired boiler, a circulating bed boiler, natural gas boilers, air compressors, fuel-handling systems, a steam turbine, cooling towers, and other power-generating equipment.

Under the lease, GM rented the land under the Powerhouse to DTEPN for ten years. Rent was $1 per year as long as DTEPN provided utilities to GM under the utility services agreement. If the utility services agreement terminated, the parties agreed to negotiate a "triple net lease" that would include rent "at fair market values." If these negotiations failed, or stalled for more than 180 days, the lease would terminate. The lease required DTEPN to keep the Powerhouse in "good order, condition and repair, casualty and reasonable wear and tear excepted" and prohibited DTEPN from committing waste on the Powerhouse's grounds or related easements. When the lease ended, DTEPN was required to surrender the Powerhouse's grounds to GM "in the same condition" as when the lease began. The lease also provided that, within 90 days after termination, DTEPN was required to "remove from the [grounds] any portion of the [Powerhouse] and any other equipment and personal property owned by [DTEPN] or parties other than [GM]."

Under the utility services agreement, DTEPN agreed to sell steam, compressed air, and electricity to GM "at the amounts required" by the nearby factory under a set pricing model. GM was also required to pay certain monthly fees "whether or not [it] received [] the Utility Services" that month. Once the factory's needs were met, DTEPN could sell utilities to third parties. DTEPN was required to maintain and repair the Powerhouse consistent with an express schedule. DTEPN was solely responsible for "Facility Maintenance" and for the "operation, repair and maintenance" of the Powerhouse. The agreement required DTEPN to operate the Powerhouse "in accordance with Prudent Industry Standards." The agreement also required DTEPN to "comply with all applicable Environmental Laws covering DTEPN's operations" on the Powerhouse's grounds, and to remediate any environmental damage caused by DTEPN's management of hazardous materials on the property.

Only GM and DTEPN signed the utility services agreement. However, DTE Energy executed a parental guaranty in which it "unconditionally and irrevocably guarantee[d] to [GM] and its successors and assigns, the due and punctual performance of, and compliance with, all

obligations, covenants, terms and conditions to be performed or complied with by DTEPN, pursuant to [the] Utility Services Agreement."

Under the environmental indemnity agreement, DTEPN agreed to indemnify GM against certain Powerhouse-related costs that arose from any third-party claims against GM, or that were reasonably incurred by GM to comply with environmental laws or protect human life or the environment.

B.

Shortly after the Project Contracts were executed, the Great Recession took its toll on the American car industry. In 2009, GM filed for Chapter 11 bankruptcy. Within two years, GM closed its factory near the Powerhouse. No longer in need of the Powerhouse's services, GM moved in bankruptcy court to reject its utility services agreement with DTEPN under 11 U.S.C. § 365(a).

DTEPN objected to GM's rejection motion, arguing that the utility services agreement could not be rejected alone because the Associated Agreements were a single, integrated contract, the components of which could not be severed from each other under Michigan law. The parties negotiated and ultimately agreed to GM's rejection of the asset purchase agreement, the lease, and the utility services agreement. The bankruptcy court entered an order consistent with this stipulation, deeming these three contracts rejected, which allowed DTEPN to file an unsecured claim for damages arising from GM's breach of the contracts. DTEPN also reserved its right as a tenant to retain possession of the leased premises under 11 U.S.C. § 365(h).

In March 2011, the bankruptcy court confirmed GM's reorganization plan, which included an "Environmental Consent Decree and Settlement Agreement" that had been entered into by GM, its affiliates, and federal, state, and local governments. Under the reorganization plan, the Revitalizing Auto Communities Environmental Response Trust ("RACER")[2] was created to "cleanup and position for redevelopment certain industrial plants and other properties formerly owned by GM." RACER assumed ownership of some GM properties, including the

---

[2]RACER's trustee is EPLET, LLC, the other plaintiff-appellant in this case. For convenience, we refer to RACER and EPLET collectively as "RACER."

land leased to DTEPN.  Once the property was transferred to RACER, GM had "no further liability, role, or residual interest" in that land.

After the rejection of the Associated Agreements, DTEPN elected to remain in possession of the Powerhouse's grounds under 11 U.S.C. § 365(h)(1)(A)(ii).  For the next six years, Defendants "remained in sole and exclusive possession" of the premises.  As the end of the lease's term neared, RACER toured the Powerhouse to evaluate its condition.  During this inspection, RACER observed lead paint peeling from the walls and asbestos-containing material scattered across the floor.  A second inspection furthered RACER's belief that DTEPN had neglected the Powerhouse and allowed hazardous material to contaminate the surrounding area.

In 2017, DTEPN vacated the Powerhouse's grounds, abandoning the Powerhouse itself. RACER inspected the Powerhouse and discovered the true extent of its disrepair:

> [T]he older, eastern portions of the Powerhouse building containing boilers 6, 7, and 8 are in a severely deteriorated condition, including significant roof failure and broken and missing window panes, which has allowed the entry of significant volumes of water that have severely damaged other building components and equipment.  As a result of the water intrusion, asbestos-containing materials consisting of asbestos-containing piping and equipment insulation have separated from almost every surface in the eastern section and are lying in a water-saturated condition on the floor.  In addition to the asbestos-containing materials, water, ice, and lead paint chips cover the floors, and subsurface structures also contain wastewater and sludges.

Saddled with a dilapidated power plant contaminating its property, RACER filed an eight-count complaint against DTEPN and DTE Energy.  RACER brought claims for (1) breach of the Associated Agreements; (2) breach of DTE Energy's guaranty; (3) quantum meruit; (4) nuisance; (5) negligence; (6) statutory waste under Michigan law; (7) violation of the Comprehensive Environmental Response, Compensation, and Liability Act; and (8) violation of Michigan's Natural Resources and Environmental Protection Act.  RACER sought to hold DTE Energy responsible for its subsidiary's wrongs by piercing the corporate veil and enforcing the parental guaranty of the utility services agreement.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the district court dismissed all claims against DTE Energy.  The court ruled that RACER had not pleaded a valid veil-piercing

theory of liability against DTE Energy because it had failed to allege that DTE Energy had used DTEPN's corporate form to commit a fraud or wrong.  The court then dismissed the breach-of-Associated-Agreements count in its entirety, concluding that the Associated Agreements (and, by extension, the parental guaranty) had terminated after GM rejected them in bankruptcy.  Finally, the court dismissed RACER's remaining claims because, absent veil-piercing, DTE Energy's liability rose and fell with its guaranty, which terminated along with the Associated Agreements outside of the statute-of-limitations period.

Although claims against DTEPN survived, the district court entered a separate judgment in favor of DTE Energy.  *See* Fed. R. Civ. P. 54(b).  RACER now appeals.

II.

We review de novo a district court's dismissal of a complaint under Rule 12(b)(6). *Giasson Aerospace Science, Inc. v. RCO Eng'g Inc*., 872 F.3d 336, 338 (6th Cir. 2017).  We accept the truth of RACER's well-pleaded factual allegations and will affirm the district court's ruling only if Defendants are entitled to judgment as a matter of law.  *Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017).  "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)).  We must construe the complaint in the light most favorable to RACER and draw all reasonable inferences in RACER's favor.  *See Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008).

RACER's appeal presents two principal issues: (1) whether RACER's claims against DTE Energy can proceed under a veil-piercing theory because RACER sufficiently pleaded that DTE Energy misused DTEPN's corporate form, and (2) whether DTEPN's § 365(h) election preserved its obligations under the utility services agreement and, by extension, DTE Energy's obligations under the parental guaranty.  We address each in turn.

III.

Michigan law presumes that the corporate form will be respected. *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co. Ltd.*, 475 F.3d 783, 798 (6th Cir. 2007) (citing *Seasword v. Hilti*, 537 N.W.2d 221, 224 (Mich. 1995)). "This presumption, often referred to as a 'corporate veil,' may be pierced only where an otherwise separate corporate existence has been used to subvert justice or cause a result that is contrary to some overriding public policy." *Seasword*, 537 N.W.2d at 224 (brackets, internal quotation marks, and citation omitted). Piercing the corporate veil is an equitable remedy "sparingly invoked to cure certain injustices that would otherwise go unredressed." *Gallagher v. Persha*, 891 N.W.2d 505, 509 (Mich. Ct. App. 2016). "Michigan courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss." *Servo Kinetics*, 475 F.3d at 798 (citing *Foodland Distribs. v. Al-Naimi*, 559 N.W.2d 379, 381 (Mich. Ct. App. 1995)).

Regarding the second element—which is the parties' main point of contention— Michigan courts have held that a breach of contract can be the kind of wrong that justifies piercing a corporate veil if the corporate form has been abused. *See, e.g.*, *1st State Title v. LP Recordings, LLC*, No. 322964, 2015 WL 7750297, at *5 (Mich. Ct. App. Dec. 1, 2015) (per curiam) (citing *Herman v. Mobile Homes Corp.*, 26 N.W.2d 757 (Mich. 1947); *Brown Bros. Equip. Co. v. State Highway Comm.*, 215 N.W.2d 591 (1974)). Thus, we must decide whether RACER sufficiently pleaded that DTE Energy exercised control over DTEPN to cause DTEPN's breach and harm RACER. *Green v. Ziegelman*, 873 N.W.2d 794, 807 (Mich. Ct. App. 2015).

While most of RACER's allegations relate to whether DTEPN was a mere instrumentality of DTE Energy, RACER has sufficiently alleged that DTE Energy exercised its control over DTEPN in a way that caused DTEPN to breach its contractual obligations and harm RACER. Specifically, RACER contends that "it was DTE Energy's decision to . . . cease maintenance and allow the operational and overall condition of the Leased Premises to deteriorate." DTEPN's lack of maintenance harmed the Powerhouse's grounds, which likely breached several of DTEPN's contractual obligations. For example, the lease required that, except for casualty and reasonable wear and tear, DTEPN was to keep the Powerhouse in "good

order, condition and repair" and prohibited DTEPN from committing waste on the premises. And, at the end of the lease, DTEPN was required to surrender the Powerhouse's grounds "in the same condition" as when the lease began. Instead, DTEPN abandoned the Powerhouse with lead paint peeling from its walls, asbestos littering its floor, and wastewater and sludge filling its subsurface structures. Similarly, the utility services agreement required DTEPN to "comply with all applicable Environmental Laws" and to remediate any environmental damage caused by its management of hazardous materials. As pleaded, DTEPN ignored these responsibilities at DTE Energy's direction, and left RACER to clean up its mess.

By allegedly directing its wholly owned subsidiary to stop maintaining the Powerhouse and thereby breach its contractual obligations, DTE Energy exercised its control over DTEPN in a way that wronged RACER. Under these circumstances, Michigan law allows RACER to pierce DTEPN's corporate veil and seek damages from DTE Energy. *See, e.g.*, *Servo Kinetics*, 475 F.3d at 800 ("If a jury finds that [the parent company] used [its subsidiary] as an instrument to commit an injurious fraud or wrong, piercing the corporate veil is proper" in a breach-of-contract case) (applying Michigan law); *Ryan Racing, LLC*, *v. Gentilozzi*, 231 F. Supp. 3d 269, 281 (W.D. Mich. 2017) ("[The sole shareholder's] actions, including his decision to cancel the contract, caused [the corporate entity] to breach the agreement with Plaintiff . . . . By causing [the entity] to breach the contract, [the shareholder] used it to commit a wrong.") (applying Michigan law); *Police & Fire Ret. Sys. of the City of Detroit v. Leibowitz*, No. 329048, 2017 WL 603551, at *5 (Mich. Ct. App. Feb. 14, 2017) (per curiam) ("Thus, to the extent that plaintiff is able to prove that defendant used [its subsidiary] as a mere instrumentality, the second element of veil piercing, that defendant used his control over the entity to cause injury to plaintiff, would be established, given that there is no question of material fact that [the subsidiary] breached the loan agreement with plaintiff.").

Defendants resist this conclusion by citing two cases from this Court: *Servo Kinetics* and *Southeast Texas Inns, Inc., v. Prime Hospitality Corp.*, 462 F.3d 666 (6th Cir. 2006). Both are distinguishable.

In *Servo Kinetics*, plaintiff contracted to become a company's exclusive distributer at a time when there were rumors that the company would be purchased by a larger company.

475 F.3d at 788. These rumors proved true, and the contracting company later became a subsidiary. *Id*. at 788–89. The now-parent company caused the now-subsidiary to breach its contract with plaintiff, and plaintiff sued the parent company, seeking to pierce the corporate veil and hold it liable for the subsidiary's breach. *Id*. at 789. The district court granted summary judgment in favor of the parent.

On appeal, the parent argued that "a party who chooses to contract with a subsidiary with knowledge of the subsidiary's separate corporate existence cannot later pursue the parent for the wrongs of the subsidiary." *Id*. at 800. We agreed that "this is a valid proposition as a general matter" and that "[t]he fact that a plaintiff has knowledge of a subsidiary's separate existence at the time of the contract is relevant because that knowledge allows an inference that the plaintiff voluntarily undertook the risks associated in contracting with the subsidiary." *Id*. But we concluded, "[t]hat fact has no relevance to the situation here, where the facts that justify piercing the corporate veil all arose *as a result* of [the parent's] acquisition of [the subsidiary]." *Id*. We also observed that, although the plaintiff "undertook the risks of contracting with an independent [subsidiary,] it did not voluntarily agree to limit its remedies for breach of contract to a corporation operated as a mere instrumentality of its parent." *Id*. We thus rejected the parent's argument and held that a reasonable jury could conclude that piercing the corporate veil was appropriate.

Defendants repeatedly cite our recognition that "[t]he fact that a plaintiff has knowledge of a subsidiary's separate existence at the time of the contract is relevant because that knowledge allows an inference that the plaintiff voluntarily undertook the risks associated in contracting with the subsidiary." *Id*. They argue that application of this permissible inference is appropriate here because GM was fully aware of DTEPN's status as DTE Energy's subsidiary when it executed the Project Contracts, as evidenced by its decision to seek a parental guaranty of only the utility services agreement.

Defendants' point is well-taken. GM's knowledge of DTEPN's separate existence at the time of contract may allow an inference that GM voluntarily undertook the foreseeable risks associated with contracting with a subsidiary. But *Servo Kinetics* does not control this appeal's outcome for two reasons. First, this case is before us at the motion-to-dismiss stage. We must

therefore draw all reasonable inferences in favor of RACER, not Defendants. Allowing the *Servo Kinetics* inference to weigh against RACER now would turn the motion-to-dismiss standard on its head. And a strict application of the *Servo Kinetics* inference at the motion-to-dismiss stage would bar *all* veil-piercing claims against a parent company as long as the plaintiff was aware of its counterparty's status as a subsidiary at the time of contract. Applying *Servo Kinetics* in this way would render Michigan's veil-piercing doctrine toothless in the vast majority of cases and would close the courthouse doors to many plaintiffs with meritorious claims—the very injustice that veil-piercing is intended to prevent.

Second, *Servo Kinetics* is simply not as far-reaching as Defendants suggest. After our recognition of the permissible inference, we acknowledged that plaintiff "did not voluntarily agree to limit its remedies for breach of contract to a corporation operated as a mere instrumentality of its parent." *Servo Kinetics*, 475 F.3d at 800. So too here. GM may have understood the remedy-limiting risk of contracting with a subsidiary, but we cannot conclude at the motion-to-dismiss stage that it assumed the risk that DTE Energy would dominate DTEPN and direct a breach of contract.

The other case that Defendants rely on is inapplicable for a different reason. In *Southeast Texas Inns*, a management company signed a contract to rent and operate hotels owned by the plaintiff. 462 F.3d at 669. The management company then "walk[ed] away" from the lease "for economic reasons." *Id*. at 670. Plaintiff sued the management company's alleged parent under a veil-piercing theory. *Id*. at 669. Applying Delaware law, the district court dismissed the suit against the parent, finding that the "complaint failed to allege circumstances evincing fraud or similar injustice." *Id*. at 671. On appeal, we first considered whether to apply Tennessee or Delaware law, but ultimately concluded that plaintiff had not established circumstances that would warrant piercing the corporate veil under either state's doctrine. *Id*. at 681. We noted that, under similar circumstances, courts applying Tennessee or Delaware law "have been justifiably hesitant to pierce the corporate veil and hold a parent company liable for the breach of a commercial lease by its subsidiary or affiliate where the parent did not guarantee the tenant's performance." *Id*. at 681–82.

Because DTE Energy only guaranteed DTEPN's performance of the utility services agreement, and not the lease, Defendants argue that we should succumb to this hesitancy here. However, *Southeast Texas Inns* is readily distinguishable from this case because we are applying Michigan law, and Michigan does not follow the same rule as Tennessee and Delaware. Unlike those states, Michigan recognizes that a breach of contract can satisfy the "fraud or wrong" requirement of its veil-piercing doctrine. *Compare Servo Kinetics*, 475 F.3d at 799–800 (citing *Herman*, 26 N.W.2d at 763; *Papo v. Aglo Rests. of San Jose, Inc.*, 386 N.W.2d 177, 185 n.15 (Mich. Ct. App. 1986)), *with Southeast Texas Inns*, 462 F.3d at 674–75. Thus, a separate guaranty is especially important in those states because it provides the only viable avenue of parental liability in breach-of-contract cases. But because a parent company in Michigan can be liable for its subsidiary's breach of contract by way of veil-piercing, the hesitancy recognized in *Southeast Texas Inns* does not apply here.

Lacking persuasive case law, Defendants appeal to practicality. They argue that RACER's allegations, "are [not] at all unusual in the context of a parent entity and its wholly-owned subsidiary," and that "[i]f [RACER's] allegations [are] sufficient to pierce the corporate veil, then the veil would be pierced in almost every instance where a shareholder or party exercises any control over a subsidiary." But such a drastic consequence will not befall Michigan corporate law if this case is allowed to proceed past the pleading stage. First of all, Defendants' dire prediction misstates the veil-piercing standard. The corporate veil cannot necessarily be pierced if the parent exercises *any* control over a subsidiary. Rather, the subsidiary must have been reduced to a "sham or mere agent or instrumentality of [the parent's] will" that the parent used "to wrong the complainant." *Green*, 873 N.W.2d at 807. Here, based on the well-pleaded allegations contained within RACER's complaint, we may draw a reasonable inference that these elements are met. Defendants' argument is better-suited for the summary judgment context, where they may revisit the veil-piercing argument and try to refute RACER's allegations

Defendants also briefly assert that RACER did not sufficiently allege that it suffered an unjust loss. But their argument on this issue is a single conclusory sentence: "Nor do Plaintiffs allege how they suffered a loss (let alone an 'unjust' loss) as a result." Thus, this issue is

forfeited for the purposes of this appeal. *See White Oak Prop. Dev., LLC, v. Washington Twp., Ohio*, 606 F.3d 842, 850 (6th Cir. 2010) ("We have cautioned that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived and that it is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (citation and ellipses omitted).

In any event, we conclude that RACER has adequately pleaded that it suffered an unjust loss. As pleaded, RACER will be responsible for clean-up costs stemming from Defendants' alleged neglect and abandonment of the Powerhouse. Maintenance and remediation costs were specifically allocated to DTEPN in the Project Contracts. DTE Energy allegedly directed DTEPN to forego these costs and allow the Powerhouse to fall into disrepair. And DTEPN is now judgment-proof because it was not adequately capitalized by DTE Energy. Viewing these allegations in the light most favorable to the plaintiffs, RACER would suffer an unjust loss if the corporate veil is not pierced.

For these reasons, the district court erred in ruling that RACER had not sufficiently pleaded facts that support piercing the corporate veil under Michigan law.

IV.

The resolution of the next issue depends on whether DTE Energy's parental guaranty survived GM's rejection of the Associated Agreements in bankruptcy. Because the guaranty is coextensive with the utility services agreement, this question in turn depends on whether the utility services agreement survived GM's rejection of the Associated Agreements in bankruptcy. RACER argues that it did because the Associated Agreements were one integrated contract. In RACER's view, when DTEPN elected to continue the lease, it also preserved its obligations under the utility services agreement, which in turn preserved DTE Energy's responsibilities under the parental guaranty. Defendants disagree, arguing that DTEPN's § 365(h) election preserved only its obligations under the lease. In Defendants' view, the guaranty died when the utility services agreement terminated after GM's rejection in bankruptcy; only the unguaranteed lease remained.

To resolve this dispute, we begin with an overview of the mechanism by which GM rejected the Associated Agreements: 11 U.S.C. § 365. This section of the Bankruptcy Code allows a debtor-in-possession to "assume or reject any executory contract or unexpired lease," if the bankruptcy court approves. 11 U.S.C. § 365(a).[3] "Section 365(a) enables the debtor (or its trustee), upon entering bankruptcy, to decide whether the contract is a good deal for the estate going forward. If so, the debtor will want to assume the contract, fulfilling its obligations while benefiting from the counterparty's performance. But if not, the debtor will want to reject the contract, repudiating any further performance of its duties." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019).

Rejection does not terminate the contract. *Id*. at 1662. Instead, the contract is considered breached. 11 U.S.C. § 365(g). Typically, this breach means that the counterparty to the contract has a claim against the estate for the debtor's nonperformance and is "in the same boat as the debtor's unsecured creditors." *Mission Prod.*, 139 S. Ct. at 1658. However, if the rejected agreement is a lease of real property in which the debtor is the landlord, the tenant can choose to either terminate the lease or remain in possession of the property:

> (i)     if the rejection by the trustee amounts to such a breach as would entitle the lessee to treat such lease as terminated by virtue of its terms, applicable nonbankruptcy law, or any agreement made by the lessee, then the lessee under such lease may treat such lease as terminated by the rejection; or
>
> (ii)    if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.

11 U.S.C. § 365(h)(1)(A)(i)–(ii). Put differently, a tenant is not required to move out if its bankrupt landlord rejects its lease; "instead, [it] may stay and pay rent (just as [it] did before) until the lease term expires." *Mission Prod.*, 138 S. Ct. at 1659. If the tenant elects to stay, it can

---

[3]Section 365(h) provides that trustees have this assumption-or-rejection power, but 11 U.S.C. § 1107 grants all the powers of trustees to debtors-in-possession like GM.

offset any damage caused by the landlord's breach against rent owed under the lease, but "shall not have any other right against the estate or the debtor." 11 U.S.C. § 365(h)(1)(B). In effect, a tenant who elects to continue a lease under § 365(h)(1)(A)(ii) waives the debtor's breach and instead opts to continue under the lease's existing terms and obligations, albeit with a more limited right of recovery against its landlord for breaches. *See In re Revel AC, Inc.,* 909 F.3d 597, 602 (3d Cir. 2018) ("[A] tenant who makes an election under this provision is entitled to remain under the same rental terms as set forth in the lease.") (internal quotations marks omitted).

One principle of § 365 is especially relevant to this case. Under § 365, a contract or lease must be assumed or rejected in its entirety. *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1226 (6th Cir. 1995) ("When the debtor assumes the lease or contract under § 365, it must assume both the benefits and the burdens of the contract."); *see also U.S. Dep't of Air Force v. Carolina Parachute Corp.*, 907 F.2d 1469, 1473 (4th Cir. 1990) ("[A] debtor may not assume the favorable aspects of a contract . . . and reject the unfavorable aspects of the same contract." (citation omitted and alteration in original)). This "'all or nothing' requirement does not mean, however, that every document denominated a 'contract' or a 'lease' must be treated as a single, indivisible whole." 2 William L. Norton, III, Norton Bankruptcy Law and Practice, § 46:11 (3d ed. 2020). If an agreement is severable from the remainder of a contract or lease, then that agreement may be assumed or rejected without assuming or rejecting the remainder of the contract. *In re Ann Arbor Consultation Servs., Inc.*, 614 B.R. 789, 796 (Bankr. E.D. Mich. 2020) (collecting cases). At the same time, "two or more contracts or leases may be part of one integrated transaction." 2 Norton, *supra* § 46:11. When agreements are integrated, a party "may not assume one agreement without also assuming all other integrated agreements." *Id.*[4]

---

[4]Typically, the question is whether contracts assumed by the trustee or debtor-in-possession are severable. But we see no reason why the analysis would be any different when evaluating whether a tenant's obligations are severable after a § 365(h) election. If the obligations are part of one contract as a matter of law, and the tenant elects to retain the benefits of that contract through § 365(h), it must also assume the contract's obligations. Defendants offer no reason why § 365 would allow a tenant, but not a debtor, to assume the benefits of a contract while rejecting its burdens or assume integrated contracts on a piecemeal basis. *See City of Covington*, 71 F.3d at 1226; *In re Spanish Peaks Holdings, II, LLC*, 872 F.3d 892, 900 (9th Cir. 2017) (11 U.S.C. § 365(h) evinces "a clear intent to protect lessees' rights outside of bankruptcy, not an intent to enhance them.").

Applying these principles to this case, the issue is best framed as this: if the lease and utility services agreement were one integrated contract, DTEPN could not assume the lease without also assuming the utility services agreement. But, if the lease and utility services agreement were severable, DTEPN could assume the lease without also assuming the utility services agreement. To answer the question of severability, we turn to Michigan law. *See In re United Air Lines, Inc.*, 453 F.3d 463, 467 (7th Cir. 2006) ("Contract severability . . . is a question of state law.").

In Michigan, the "intent of the parties" is the "primary consideration" in determining severability. *Prof'l Rehab. Assocs. v. State Farm Mut. Auto Ins. Co*., 577 N.W.2d 909, 913 (Mich. Ct. App. 1998). "'As a general rule, a contract is entire when, by its terms, nature and purpose, it contemplates that each and all of its parts are interdependent and common to one another and to the consideration, and is severable when, in its nature and purpose, it is susceptible of division and apportionment.'" *Dumas v. Auto Club Ins. Ass'n*, 473 N.W.2d 652, 659 (Mich. 1991) (quoting *City of Lansing v. Lansing Twp*., 97 N.W.2d 804 (Mich. 1959)). Severability "is ordinarily determined by inquiring whether the contract embraces one or more subject matters, whether the obligation is due at the same time to the same person, and whether the consideration is entire or apportioned." *City of Lansing*, 97 N.W.2d at 813. "If the agreements are interdependent and the parties would not have entered into one in the absence of the other, the contract will be regarded as entire and not divisible." *Stokes v. Millen Roofing Co*., 649 N.W.2d 371, 374 (Mich. 2002) (citation and alterations omitted).

Viewing RACER's complaint and the contracts incorporated therein in RACER's favor, we conclude that RACER has sufficiently established that the utility services agreement and the lease are not severable from each other. Most importantly, each contract explicitly stated that it was vital to the other and that GM and DTEPN would not have entered into either without the other. This explicit recognition supports a strong inference that the parties intended the lease and the utility services agreement to be interdependent. *See Quality Prods. & Concepts Co. v. Nagel Precision, Inc*., 666 N.W.2d 251, 259 (Mich. 2003) ("[A]n unambiguous contractual provision is reflective of the parties' intent as a matter of law.").

The two agreements also embrace the same subject matter: DTEPN's occupancy and use of the Powerhouse and its grounds.  And the lease's terms and consideration depended on the utility services agreement.  As long as the utility services agreement was in effect, DTEPN's yearly rent under the lease was $1.  But, "[i]n the event the Utility Services Agreement [] terminated and [DTEPN] elect[ed] to continue to operate the [Powerhouse] under this Lease," the parties agreed to negotiate a "triple-net" lease, which was to be "set forth in an amendment to, or restatement of this Lease" "with terms that are customary for a lease of this nature" and rent at a fair market rate.  Thus, the parties understood that, without the utility services agreement, the lease would have to be rewritten for DTEPN to continue to occupy the property.

Moreover, treating these agreements as one is consistent with how GM and DTEPN treated them in GM's bankruptcy proceeding.  There, DTEPN objected to GM's rejection motion, arguing that the utility services agreement *could not* be rejected alone because the Associated Agreements *were a single, integrated contract*.  DTEPN told the bankruptcy court that the Associated Agreements were "a single agreement" under Michigan law because they were executed by the same parties on the same day, they explicitly stated that they were an integrated transaction, and they were "supported by consideration provided by the parties through the other Project Contracts." Obj. of DTE Pontiac North, LLC, to Debtor's Mot. Pursuant to 11 U.S.C. § 365(a) to Reject Utility Services Agreement at 7, *In re Motors Liquidation Co*., No. 09-50026 (Bankr. S.D.N.Y. filed Jan. 28, 2011).[5]  These arguments ring as true today as they did before the bankruptcy court.  DTEPN's objection, along with the later stipulated-to rejection of the Associated Agreements as a whole, further indicates that the parties believed that these contracts were interdependent.

Defendants argue, however, that finding non-severability would lead to an absurd result.  After all, GM shut down the factory that the Powerhouse was supposed to be supplying, so utilities could not be bought or sold under the utility services agreement.  But the utility services

---

[5]Defendants now take precisely the opposite position.  "The doctrine of judicial estoppel prevents a party who successfully assumed one position in a prior legal proceeding from assuming a contrary position in a later proceeding." *Mirando v. U.S. Dep't of Treas.*, 766 F.3d 540, 546 (6th Cir. 2014).  Although we need not decide severability on these grounds, *see infra*, it does not escape our notice that Defendants appear to be maintaining inconsistent litigating positions.

agreement did not contemplate *only* the sale of utilities. It also contained numerous environmental and maintenance covenants, which RACER alleges were breached by DTEPN. Those are the contractual obligations at play in this case, not obligations regarding the sale or purchase of utilities. We also note that the utility services agreement provides for a scenario where GM received no utilities during a month but was nonetheless obligated to pay certain fees to DTEPN, which bolsters the conclusion that the utility services agreement dealt with more than just the provision of utilities. Thus, our conclusion is not the absurd result that Defendants make it out to be.

Given the express language of the agreements, the related subject matters, the interdependent obligations and considerations, and the parties' positions in GM's bankruptcy proceedings, the district court erred in finding that the lease and utility services agreement were severable as a matter of law at the motion-to-dismiss stage. RACER has sufficiently established that the parties to these contracts considered them to be interdependent and that these contracts are non-severable under Michigan law. *See Stokes*, 649 N.W.2d at 374. Accordingly, DTEPN could not elect to continue the lease under 11 U.S.C. § 365(h) without its related obligations under the utility services agreement. And because DTE Energy guaranteed DTEPN's obligations under the utility services agreement—including its obligations regarding maintenance, environmental costs, and remediation—DTE Energy's guaranty is likewise joined to DTEPN's § 365(h) election. Thus, the district court erred in dismissing RACER's claims against DTE Energy for breach of the Associated Agreements and for breach of its guaranty.[6]

---

[6]The parties raise various other arguments, but our resolution of the two principal issues on appeal is dispositive. Because we hold that, as pleaded, the lease and the utilities services agreement are not severable, we necessarily reject Defendants' argument that DTEPN's filing of a proof of claim and subsequent nonperformance terminated the utility services agreement. The lease and the utility services agreement were integrated and DTEPN's election to remain in possession of the premises preserved its obligations under the utility services agreement and DTE Energy's obligations under the guaranty. Our holding also invalidates the district court's statute-of-limitations ruling because Defendants' obligations under the Associated Agreements and the guaranty survived until the premises was turned over to RACER in 2017, well within the six-year statute of limitations. And because the district court erred in dismissing RACER's claims against DTE Energy, RACER's appeal of the partial denial of leave to amend its complaint is moot.

V.

For these reasons, we **REVERSE** the district court's dismissal of RACER's amended complaint regarding DTE Energy; **REVERSE** the district court's dismissal of RACER's breach-of-Associated-Agreement claim regarding DTE Energy; and **REMAND** to the district court for proceedings consistent with this opinion.