NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0523n.06

Case No. 23-1318

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Dec 13, 2023

KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| HARTFORD UNDERWRITERS INSURANCE COMPANY; TWIN CITY FIRE INSURANCE COMPANY; HARTFORD FIRE INSURANCE COMPANY; PROPERTY & CASUALTY INSURANCE COMPANY OF HARTFORD; TRUMBULL INSURANCE COMPANY; HARTFORD CASUALTY INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs-Appellees, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| DAVID OTTO, | ) ) | OPINION |
| Defendant - Appellant. | ) ) ) | |

Before: CLAY, GIBBONS, and GRIFFIN, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Hartford Underwriters Insurance Company, Twin City Fire Insurance Company, Hartford Fire Insurance Company, Property & Casualty Insurance Company of Hartford, Trumbull Insurance Company, and Hartford Casualty Insurance Company (collectively "Hartford") sued David Otto to hold him individually liable for a judgment they received against his company, Omega Resources Solutions, LLC ("Omega"). The district court granted Hartford's motion for summary judgment, and Otto now appeals.

I.

Omega was in the business of providing retailers across the United States with employees to perform basic tasks. David Otto instructed his son, Anthony Sabatella, to purchase Omega in

2014, and Otto then acquired the company from Sabatella a few years later. At that point, Otto became the sole member and shareholder of Omega.

Omega contracted with Hartford for workers' compensation insurance ("Policy") from 2015 to 2016 and again from 2016 to 2017. The Policy required Omega to pay Hartford certain premiums upfront, based on a variety of factors like projected wages, and permitted Hartford to conduct an audit after the fact to determine whether Omega owed additional premiums based on Omega's actual expenditures. After conducting the audit for the 2015–16 and 2016–17 Policy periods, Hartford billed Omega an additional $1,374,967 for unpaid premiums. The significant bill resulted, in part, because of a change in Omega's employee code and because Omega's actual payroll expenditures were more than double the amount it projected to Hartford at the start of the Policy period.

Hartford sent Omega a final bill outlining the additional premiums it owed as a result of the audit, and, in response, Omega filed a claim with the Michigan Department of Insurance and Financial Services ("DIFS") to dispute the charge. Shortly afterwards, however, Omega's counsel moved to withdraw from the dispute, noting that Omega had gone out of business and was unable to pay him. An Administrative Law Judge granted counsel's motion, ordered Omega to hire new counsel by a specific date, and later dismissed the claim on Hartford's motion after Omega failed to follow through with the mandate.

About a month after the DIFS complaint was dismissed, Hartford sued Omega for breach of contract in federal court to collect on the unpaid premiums and related interest. Omega did not defend the case and the district court granted Hartford's motion for default judgment. Hartford attempted to collect on the judgment through writs of garnishments directed at the banks Omega

used, but the writs were returned unexecuted.[1] With an inability to access Omega's assets, Hartford sought post-judgment discovery to see whether it could collect the debt from Otto personally. A Magistrate Judge recommended that the district court deny Hartford's attempt at post-judgment discovery based on a Michigan procedural issue; but, nevertheless, the judge mentioned that "Michigan law would appear to allow plaintiffs to pierce defendant's corporate veil and seek damages from Otto." DE 16-20, R&R, at PageID 1334. The district court later adopted the Report and Recommendation.

Hartford then filed this suit seeking a declaratory judgment to hold Otto personally liable for the default judgment it received against Omega. The parties eventually filed cross motions for summary judgment and the district court later granted Hartford's motion in full. Otto now appeals the summary judgment order.

## II.

This court reviews the district court's grant of summary judgment de novo. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether summary judgment is appropriate, the court views the "evidence in the light most favorable to the nonmoving party." *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003) (citation omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases omitted). The court must decide "whether the evidence presents a

---

[1] The writ directed to Citizens Bank indicated that Omega's account was closed on April 15, 2018, which occurred during the pendency of its appeal to DIFS.

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

"Because subject matter jurisdiction in this case is based on diversity of citizenship, the substantive law of the forum state must be applied." *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 195 (6th Cir. 2015) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941), and *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526 (6th Cir. 2006)). "When the state's highest court has not spoken on the issue, the federal court is called upon to predict what that court would do if confronted with the question." *Id.* (citing *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 608 (6th Cir. 2012), and *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004)). This case is controlled by Michigan law.

III.

Michigan law presumes the integrity of the corporate form. *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co. Ltd.*, 475 F.3d 783, 798 (6th Cir. 2007) (citing *Seasword v. Hilti, Inc.*, 537 N.W.2d 221, 224 (Mich. 1995)). That is, Michigan and its courts will perpetuate the legal fiction that corporations are separate and distinct from their members, even if a single individual owns and operates the entity, under most conditions. *Green v. Ziegelman*, 873 N.W.2d 794, 803 (Mich. Ct. App. 2015). "This presumption, often referred to as a 'corporate veil,' may be pierced only where an otherwise separate corporate existence has been used to 'subvert justice or cause a result that [is] contrary to some other clearly overriding public policy.'" *Seasword*, 537 N.W.2d at 224 (alteration in original) (quoting *Wells v. Firestone Tire & Rubber Co.*, 364 N.W.2d 670, 674 (Mich. 1984)).

Traditionally, courts pierce the corporate veil to protect an entity's creditors where there is unity of interest among the entity's members and where the members use the corporate structure

to avoid legal obligations. *See Foodland Distribs. v. Al Naimi*, 559 N.W.2d 379, 381 (Mich. Ct. App. 1996); *see also Allstate Ins. Co. v. Citizens Ins. Co. of America*, 325 N.W.2d 505, 508 (Mich. Ct. App. 1982). However, there is no brightline rule for determining whether the veil should be pierced. *Foodland Distribs.*, 559 N.W.2d at 381. Instead, courts look at the totality of circumstances surrounding the entity and its use. *See Klager v. Robert Meyer Co.*, 329 N.W.2d 721, 725 (Mich. 1982).

Despite the lack of a hard and fast rule on the matter, Michigan courts will find piercing the corporate veil appropriate when "(1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss." *Servo Kinetics*, 475 F.3d at 798 (citing *Foodland Distribs.*, 559 N.W.2d at 381).[2]

A. *Mere Instrumentality.*

The "mere instrumentality" factor focuses, in large part, on the extent to which a company is controlled by its owner or a separate entity. *People ex rel. Attorney General v. Mich. Bell Tel. Co.*, 224 N.W. 438, 440 (Mich. 1929) ("Where a corporation is so organized and controlled, and its affairs so conducted, as to make it a mere instrumentality or agent or adjunct of another corporation, its separate existence as a distinct corporate entity will be ignored."); *Herman v. Mobile Homes Corp.*, 26 N.W.2d 757, 758 (Mich. 1947) ("[P]laintiffs . . . did establish . . . that the latter were so completely controlled and dominated by defendant . . . as to make each of them the mere instrumentality . . . ."); *Maki v. Copper Range Co.*, 328 N.W.2d 430, 433 (Mich. Ct. App. 1982) (noting the prong is met when plaintiff shows "control by the parent to such a degree that

---

[2] For reference, and as relevant here, the same rules that apply to piercing the veil of a corporation also apply to piercing the veil of a limited-liability company. *Florence Cement Co. v. Vettraino*, 807 N.W.2d 917, 922 (Mich. Ct. App. 2011).

the subsidiary has become its mere instrumentality"). However, Michigan courts also consider a variety of other points in addressing this factor, including undercapitalization of the company, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the company is a sham. *See Glenn v. TPI Petroleum, Inc.*, 854 N.W.2d 509, 520 (Mich. Ct. App. 2014); *see also Laborers' Pension Tr. Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 704–05 (6th Cir. 1988).

Here, the undisputed facts show that Otto had absolute control over Omega such that it served merely as his instrumentality. Otto directed his son, Anthony Sabatella, to purchase Omega in January 2014. At the point of purchase, Sabatella became the sole member of Omega and maintained that exclusivity until he transferred Omega to Otto in January 2018. Despite Sabatella's status in the company at that time, his relationship with Omega was purely nominal. That is, during his time as Omega's sole member, Sabatella did not hire or fire any employees and did not oversee the company's financials.[3] Instead, all of those matters were ultimately decided by Otto in his capacity as the sole member of America's Back Office ("ABO"), a human resources business. Even without formal ownership, Otto controlled Omega.

Otto's authority over Omega was extensive. Not only did he act as the "point person" for Omega's legal matters, but he also dictated several aspects of Omega's finances. For example, Otto directed Omega into various contractual relationships, including several with his own companies; served as the sole signatory on Omega's checks; and decided when to pay, and, perhaps more crucially, when to withhold payment from, Omega's creditors.

---

[3] Sabatella also did not receive any additional pay for his role in Omega.

Otto also controlled Omega's winding down process. In doing so, Otto opted to pay his own companies hundreds of thousands of dollars in management fees instead of compensating Hartford for its post-audit workers compensation premiums. And although Omega eventually halted its operations completely, Otto essentially continued the venture through his other companies. After it shut down, for example, all of Omega's clients started doing business with ABO in its stead.

In addition to exercising complete control over Omega, Otto failed to maintain proper corporate formalities in managing the company. Although Omega contracted with several of Otto's other companies for various services, none of these contracts were recorded. Instead, Omega entered into oral contracts with Otto's other entities.[4] But even when Otto maintained records for Omega, they were often flawed and underscored that Otto's companies operated as a single entity in substance, if not in form. For example, Omega's year-end balance sheets recorded improper assets and debts. At times, the balance sheet reflected odd results, like that Omega owed a significant monetary liability to itself. Michael Zybura, the person responsible for the "accounting, finance, taxes and compliance" for all of Otto's entities, claimed that he did not trust any of the calculations on Omega's balance sheet, despite creating the statement himself. DE 16-13, Zybura Dep., PageID 913–14. Indeed, Zybura stated that he conducted the accounting for all of Otto's entities on a "consolidated basis," and that the line items on Omega's balance sheet lacked any "validity to being right." *Id.* at PageID 950. Zybura further acknowledged that Omega's 2017 year-end balance sheet was for all intents and purposes pure fiction, as "the only asset . . . that was real was the cash in the bank." *Id.* at 989–90. He also added that Omega never

---

[4] One example of this "contract" occurred when Otto, acting on behalf of Omega, entered into an agreement with himself, on behalf of America's HR Department (another company of which Otto was the sole member), for management services.

attempted to collect on any debt that it was owed from Otto's other companies because, given the consolidated nature of the entities, transfers between them "would be like asking yourself for five dollars you owe yourself." *Id.* at 955–56.

Otto does not dispute any of the information above. Instead, he argues that none of the six *Glenn* factors support a finding that Omega was merely his instrumentality. Otto's belief is without merit. First, satisfaction of the *Glenn* factors is not determinative of whether an entity is a mere instrumentality of another. Courts are not required to analyze the *Glenn* factors, and they serve only as a helpful benchmark for evaluating the instrumentality prong. *Police & Fire Ret. Sys. of the City of Detroit v. Leibowitz*, No. 329048, 2017 WL 603551, at *8 (Mich. Ct. App. Feb. 14, 2017). In fact, courts often determine that an entity is a mere instrumentality of another without mention of the *Glenn* factors. *See EPLET, LLC v. DTE Pontiac N., LLC*, 984 F.3d 493, 500–03 (6th Cir. 2021); *Green*, 873 N.W.2d at 808–09.

Second, even if the *Glenn* factors can provide some insight here, Otto improperly framed the material facts. For example, Otto attests that Omega and his other entities maintained corporate formalities because each venture had its own articles of incorporation. However, Otto ignores the extensive factual record, recounted above, outlining the shortcuts that he and his ventures undertook. Following *one* formality in organization does not mean Omega followed formalities in practice. Likewise, Otto claims that Omega and his other entities maintained separate books and that that fact speaks towards Omega being an independent company. But again, Otto's argument overlooks the material issue, which concerns the intermingling of assets between Omega, Otto, and Otto's other companies. Speaking to that issue, Zybura claimed that Omega's balance sheets were unreliable, that the accounting for Otto's ventures was done on a consolidated basis, and that Omega never sought to collect on the debts that it was owed from Otto's companies.

These insights into Omega's finances provide a better picture as to whether it was Otto's instrumentality than the existence of separate books. *See Servo Kinetics*, 475 F.3d at 799; *see also Green*, 873 N.W.2d at 808–09.

Considering the complete control that Otto exercised over Omega, and given the untrustworthy accounting as well as the disregard of its corporate form, it is clear that Omega served merely as Otto's instrumentality.

B. *Fraud or Wrong.*

Having determined that Otto operated Omega as a mere instrumentality, we next ask whether he exercised control over Omega in a manner that caused a fraud or wrong. *Green*, 873 N.W.2d at 807. The uncontroverted evidence shows that he did.

A breach of contract constitutes a "fraud or wrong" that justifies piercing the corporate veil under Michigan law. *EPLET, LLC*, 984 F.3d at 499, 502; *Servo Kinetics*, 475 F.3d at 799–800; *Herman*, 26 N.W.2d at 762–63; *Gallagher v. Persha*, 891 N.W.2d 505, 513–14 (Mich. Ct. App. 2016); *1st State Title v. LP Recordings, LLC*, No. 322964, 2015 WL 7750297, at *5 (Mich. Ct. App. Dec. 1, 2015). In that vein, it is undisputed that Otto caused Omega to breach its contract with Hartford when he refused to authorize payment for the post-audit workers' compensation premiums and instead chose to close down Omega and transfer its assets to other companies that he owned. As a result, the 'fraud or wrong' prong is satisfied, a circumstance that supports piercing the corporate veil.[5]

Although Otto concedes that Omega breached its contract with Hartford, he claims the second prong is met only when there exists "some fraud independent of the breach." Appellant

---

[5] The court acknowledges that Otto's actions were more than sufficient to meet this second prong. *Green*, N.W.2d 794 at 807 ("[I]t is not necessary to prove that the owner caused the entity to directly harm the complainant; it is sufficient that the owner exercised his or her control over the entity in such a manner as to wrong the complainant.").

Br. at 28. In coming to this conclusion, Otto misreads cases, attempts to apply both non-binding and non-veil piercing caselaw, and ignores longstanding precedent to the contrary. His arguments do not raise a genuine dispute of material fact, but simply reveal a misunderstanding of the law.

C. *Unjust Loss.*

As a final matter, we must consider whether the breach of contract caused Hartford to suffer an unjust loss. *Green*, 873 N.W.2d at 807. The record is clear here that Hartford lost a substantial amount of money because Otto and Omega refused to pay its debt. This fact, in and of itself, satisfies the "unjust loss" prong. *See Servo Kinetics*, 475 F.3d at 800; *1st State Title*, 2015 WL 7750297, at *5. Additionally, when Omega wound down and transferred its assets to other companies, Otto perpetuated the wrong initiated by the breach of contract, which prevented Hartford from collecting on its debt with a judgment. Hartford's inability to collect from Omega also contributed to its unjust loss. *See Thomas v. Khrawesh*, 738 F. App'x 870, 871 (6th Cir. 2018).

Otto contends that Hartford did not suffer an unjust loss because its post-audit bills put Omega out of business and thus caused its own loss. Notwithstanding his inappropriate attempt to relitigate the breach issue, Otto misinterprets this causation exception to the unjust loss prong. Although Otto is correct that a third party may be barred from claiming an unjust loss where the loss is attributable to that party's conduct, *see, e.g.*, *Police & Fire Ret. Sys. of the City of Detroit*, 2017 WL 603551, at *8, he has not offered any proof on that issue as to create a genuine dispute of material fact. For example, Otto fails to show that Hartford knew, or had reason to know, that imposing these additional premiums would cause Omega to wind down. *See Klager*, 329 N.W.2d at 727 n.6. As a result, and looking at the undisputed evidence, Hartford suffered an unjust loss because of Otto's and Omega's wrongful conduct.

Considering the information and analysis above, and because the undisputed evidence satisfies all three prongs of the test for piercing the corporate veil, the district court did not err in granting summary judgment for Hartford.

IV.

For the reasons stated above, we affirm.